UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| SERGEY KANTSEVOY,<br>4 Melisa Court<br>Owings Mills, MD 21117<br><br>*Plaintiff*,<br><br>v.<br><br>LUMENR LLC,<br>6222 Thornton Avenue<br>Newark, CA 94560<br>c/o Harvard Business Services, Inc.<br>16192 Coastal Highway<br>Lewes, DE 19958<br><br>*Defendant*. | Civil Action No. 17-359 |

## COMPLAINT

Plaintiff Sergey Kantsevoy, M.D. files his Complaint against Defendant LumenR LLC ("**LumenR**"), and alleges:

### NATURE OF ACTION

1. This is a case about a business that wanted to get something for nothing. The business (LumenR) had its chief executive officer (Gregory Piskun, M.D.) approach one of America's leading gastroenterologists (Dr. Kantsevoy) about a medical device specific to that field. In a June 12, 2010 email, Dr. Piskun asked Dr. Kantsevoy to provide expert consulting services to LumenR to develop a tissue retractor in exchange for a set hourly/per diem fee and a promise of "an equity ownership package" that would provide "a very substantial exit" upon sale of the device.

2. LumenR's strategy worked. Assuming he was a part owner of the device at the exit, Dr. Kantsevoy invested much more time, effort, and money developing and promoting the device than would have been the case if he were a mere independent contractor. Dr. Kantsevoy's efforts and stellar reputation greatly benefited LumenR. His suggested design changes made the device functional. His scientific article and numerous presentations enabled the device to gain acceptance in the medical community. And his promotional efforts and direct access to major medical-device manufacturers helped LumenR attract a buyer of the technology.

3. Despite the significant benefits that Dr. Kantsevoy provided, LumenR has refused, and continues to refuse, to provide him any equity interest in the company or to otherwise fully compensate him for his services despite having sold the medical device to a manufacturer for, upon information and belief, approximately $40 million. Therefore, Dr. Kantsevoy has no choice but to bring this action.

**THE PARTIES**

4. Plaintiff Dr. Kantsevoy is an internationally known gastroenterologist who practices at the Center for Therapeutic Endoscopy at Mercy Hospital in Baltimore, Maryland. He earned his medical degree in Russia before immigrating to the United States in 1992 for his residency and fellowship. A certified specialist in both gastroenterology and hepatology, Dr. Kantsevoy is a Clinical Professor of Medicine at the University of Maryland School of Medicine and the Director of Therapeutic Endoscopy in the Melissa L. Posner Institute for Digestive Health & Liver Disease at Mercy Hospital. As a clinical physician, Dr. Kantsevoy treats prominent political figures, artists, successful businesspersons, and other national and international celebrities. Furthermore, as a key opinion leader and world-renowned authority in interventional endoscopy and endoscopic ultrasound, Dr. Kantsevoy is a seasoned lecturer and a well-published author. During his thirty-three years of practice, Dr. Kantsevoy published several

textbooks and well over one hundred peer-reviewed scientific articles, and he has presented at medical symposiums and forums of the highest caliber.

5. Defendant LumenR is a Delaware limited liability company headquartered in Newark, California. It is a medical device company founded by Dr. Piskun, its current chief executive officer. Upon information and belief, LumenR's assets are intermingled with those purportedly belonging to Dr. Piskun personally and his investors.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Dr. Kantsevoy is a citizen of Maryland, while LumenR is a citizen of Delaware and California.

7. This Court has specific jurisdiction over LumenR because, during the negotiations and performance of the agreement at issue here, it (through the acts of its chief executive officer, Dr. Piskun) reached into the forum whenever it contacted Dr. Kantsevoy when he was physically in Maryland, and whenever it paid for his consulting services by sending checks to Dr. Kantsevoy's Maryland home address.

8. As described above, LumenR (through its chief executive officer, Dr. Piskun) negotiated and entered the agreement with Dr. Kantsevoy at issue here when the plaintiff was physically in Maryland, and payments made under those agreements were sent to Dr. Kantsevoy's Maryland home address. Thus, venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here.

**LumenR obtained Dr. Kantsevoy's consulting services.**

9. Dr. Piskun founded LumenR in January 2009. Operating under his direction, the company sought to develop medical devices used during endoscopic resection of lesions in the colon, esophagus, or stomach. Specifically, its effort focused on one particular device—a tissue retractor, named the LumenR Tissue Retractor System (the "**Tissue Retractor**"). The Tissue Retractor was designed to improve endoscopic sub-mucosal dissection ("**ESD**") and endoscopic mucosal resection ("**EMR**") procedures to remove precancerous lesions and malignant tumors in the colon, esophagus, and stomach. ESD and EMR procedures are less-invasive alternatives to conventional surgery; the Tissue Retractor is designed to aid physicians performing those life-saving procedures by enabling enhanced visualization of lesions and creating a stable working environment to support tissue retraction and resection during these procedures.

10. In May 2010, Dr. Piskun approached Dr. Kantsevoy during Digestive Disease Week, the world's largest gathering of physicians, researchers, and industry representatives in the fields of gastroenterology, hepatology, endoscopy, and gastrointestinal surgery. Specifically, he wanted to know whether an early version of the Tissue Retractor would be helpful in clinical practice to treat patients with colonic bleeding or perforations. LumenR had not done much to develop the device as of then: although Dr. Piskun filed a couple of patent applications, he did not show Dr. Kantsevoy a prototype.

11. After reviewing Dr. Piskun's technical drawing, Dr. Kantsevoy determined that such a device could potentially be useful if the design was substantially modified. Dr. Kantsevoy also suggested promoting the device for the endoscopic removal of precancerous lesions and early cancers of the gastrointestinal tract (using EMR and ESD procedures)—an idea which Dr. Piskun gladly accepted.

12.     Seeking to benefit from Dr. Kantsevoy's expertise and the good will associated with his name, on June 12, 2010, Dr. Piskun invited Dr. Kantsevoy to formally join the development team. The offer included a promise to pay Dr. Kantsevoy the lesser of $500 per hour or $2500 per day for his consulting services. It also included a promise to "create an equity ownership package which may give a very substantial exit for [him]." The parties understood that LumenR would provide Dr. Kantsevoy a reasonable equity package, the precise amount of which would be mutually and reasonably agreed upon later based on his contributions to the design, development, testing, and marketing of the Tissue Retractor. Dr. Kantsevoy accepted the offer that day, and on June 13, 2010 (*i.e.*, the next day), Dr. Piskun acknowledged in writing that Dr. Kantsevoy accepted the offer to work for LumenR.

13.     Although Dr. Kantsevoy subsequently pressed Dr. Piskun for the specifics of the equity package, LumenR's chief executive officer refused to provide a straightforward answer, averring that he could not provide a specific number because the acquisition price was too uncertain. But Dr. Piskun repeatedly assured him that LumenR would adequately compensate Dr. Kantsevoy for his time and efforts as well as for the good will and publicity generated by his association with the Tissue Retractor. For instance, during a July 2015 flight to Amsterdam, Dr. Kantsevoy again asked Dr. Piskun about the equity compensation. Dr. Piskun confirmed that Dr. Kantsevoy would be provided an equity stake in LumenR, but the exact value of that interest would have to wait for the sale of the technology. Similarly, during a February 2016 trip to Amsterdam, Dr. Piskun informed Dr. Kantsevoy that the Tissue Retractor had drawn the interest of a prospective buyer. Again, however, Dr. Piskun stated that he could not determine the exact value of Dr. Kantsevoy's equity interest until the acquisition price is finalized.

14. In light of Dr. Piskun's promise of an equity stake in LumenR, Dr. Kantsevoy began providing consulting services to LumenR. On February 25, 2012, Dr. Kantsevoy conducted the first animal laboratory experiments using a prototype, but quickly discovered that the device did not work. That first round of animal testing ended in failure. Due to design flaws in the LumenR-designed prototype, Dr. Kantsevoy could not complete the endoscopic procedures.

15. Dr. Kantsevoy immediately diagnosed the problem and proposed a solution. The prototype consisted of four bare wires, and Dr. Kantsevoy discovered that the bowel would collapse around the wires. Dr. Kantsevoy's proposed solution—encompassing the wires in a covered plastic chamber to prevent a collapse of the colonic wall around the wires—made the device functional. When the next animal test was conducted in June 2012, after the device was modified according to Dr. Kantsevoy's suggestion, Dr. Kantsevoy was able to successfully complete the first endoscopic procedure. Seeing the value of Dr. Kantsevoy's proposed solution, LumenR filed additional patent applications to protect the covered plastic chamber and incorporated the covered plastic chamber in all subsequent prototypes.

16. Dr. Kantsevoy subsequently conducted nineteen additional animal experiments for LumenR. In each, he was the only physician to perform a relevant procedure. In or about October 2012, Dr. Kantsevoy decided that the prototype was ready for testing on humans. He spent approximately forty hours drafting a human study protocol and submitted it to both Mercy Hospital's Institutional Review Board and the U.S. National Institutes of Health. The protocol was approved. Dr. Kantsevoy conducted the first three successful tests on humans in May 2013, and he has gone on to perform over fifty human procedures using the device since then. Each of these patient studies was self-funded by Dr. Kantsevoy.

17. Contingent upon Dr. Piskun's repeated promise of an equity stake in LumenR, Dr. Kantsevoy did more than merely improve the device so it would be functional and perform the critical clinical studies for LumenR. He also continued to offer numerous suggestions to further improve the device, several of which were incorporated into later patent applications filed with the U.S. Patent and Trademark Office. For example, during the clinical trials on humans, Dr. Kantsevoy realized that the device would be even more effective if it used a retractor (a mechanism for pushing away the colonic lesions) instead of grasping forceps (a mechanism for pulling and tearing the colonic lesions). Dr. Piskun once again agreed with Dr. Kantsevoy's assessment. The LumenR engineering team reworked the device's basic mechanism, and Dr. Piskun filed a patent application for this retractor-based design. Dr. Piskun, however, never informed Dr. Kantsevoy of this patent application—and did not include Dr. Kantsevoy as a co-inventor.

18. Dr. Kantsevoy is named as a co-inventor in several other patent applications filed by LumenR. Dr. Kantsevoy assigned his intellectual property rights in those patent applications for a symbolic fee of $1 and "other good and valuable consideration," which was understood to include the "equity ownership package" that would provide Dr. Kantsevoy "a very substantial exit." In the absence of the promise of an equity stake in LumenR, Dr. Kantsevoy would not have assigned his valuable intellectual property interests in any of those patent applications to LumenR.

19. Dr. Kantsevoy also published an academic paper describing the tests he conducted on animals using the device he improved. He made thirty-six presentations about the technology at numerous scientific meetings in the United States and across the globe. Dr. Kantsevoy even invested time and effort into marketing the Tissue Retractor by discussing the device and

commercialization concept with multiple potential investors and by conducting numerous training sessions to familiarize other physicians in the United States and around the world with this technology and its use. Dr. Kantsevoy used his personal contacts, his time, and the good will associated with his name to attract the interest of multiple medical device manufacturers. He would not have exerted such substantial efforts had he not been promised "an equity ownership package" in the Tissue Retractor.

20. LumenR benefited from their use of Dr. Kantsevoy's nationally and internationally recognized reputation, his "sweat equity," and its understanding that his meaningful involvement would lead to greater and faster acceptance of the Tissue Retractor by the medical community and potential buyers of the technology.

**LumenR did not properly compensate Dr. Kantsevoy.**

21. Although LumenR profited greatly from its association with Dr. Kantsevoy, the company has consistently failed to live up even to its written promise to pay the agreed-upon consulting fees. Despite the clear obligation to pay either $500 per hour or $2500 per day for his consulting services, Dr. Kantsevoy was paid in full per the agreement only for services rendered in relation to ten workshops Dr. Kantsevoy put on to familiarize the medical community with the Tissue Retractor. Conversely, LumenR compensated Dr. Kantsevoy for only eight of the twenty-one animal laboratory experiments he conducted, and even for these eight, it underpaid Dr. Kantsevoy by $500 each time. LumenR has never compensated Dr. Kantsevoy for the substantial amount of time he spent (i) drafting the human studies protocol and its annual renewals; (ii) conducting the human studies; (iii) drafting papers about the Tissue Retractor for medical journals; (iv) preparing and presenting video and in-person reports and demonstrations about the device at scientific conferences, several of which were held abroad; (v) developing improvements to the device and assisting in pursuit of some of the patent applications directed to

such improvements; and (vi) marketing the Tissue Retractor to potential buyers. Moreover, LumenR never compensated Dr. Kantsevoy for time spent traveling to and from the animal laboratory experiments or scientific conferences, nor did it fully reimburse Dr. Kantsevoy for his travel costs.

22. In numerous communications, LumenR admitted to gaps in its recordkeeping and offered to make Dr. Kantsevoy whole. But LumenR never provided additional payments.

**LumenR disavows Dr. Piskun's repeated offers of equity in the company to Dr. Kantsevoy.**

23. LumenR now says that Dr. Piskun never promised Dr. Kantsevoy "an equity ownership package" in the company upon sale of the Tissue Retractor. For example, in April 2016, when Olympus Corporation of the Americas ("**Olympus**") showed interest in purchasing the Tissue Retractor, Dr. Kantsevoy pressed Dr. Piskun to specify in writing what LumenR considered a reasonable equity interest in LumenR based on Dr. Kantsevoy's investment in the Tissue Retractor. But Dr. Piskun disavowed his repeated offers of an equity stake in the company and, instead, proposed to compensate Dr. Kantsevoy in the form of vague promises that Olympus would fund Dr. Kantsevoy's future research or sponsor his scientific conferences.

24. LumenR and Olympus did not consummate a deal regarding the Tissue Retractor. Rather, LumenR sold the Tissue Retractor to Boston Scientific Corporation ("**Boston Scientific**")—another significant medical device manufacturer that Dr. Kantsevoy previously introduced to Dr. Piskun.

25. Upon information and belief, Boston Scientific purchased the rights to the Tissue Retractor for approximately $40 million. In the November 3, 2016 press release announcing its acquisition of the technology, Boston Scientific referenced two published works authored by Dr. Kantsevoy, even though LumenR never even informed Dr. Kantsevoy of its sale of the Tissue Retractor.

9

# CAUSES OF ACTION

## Count I
## Breach of Express Contract

26. Dr. Kantsevoy incorporates by reference the allegations contained in the preceding paragraphs.

27. On June 12, 2010, LumenR made a written offer to Dr. Kantsevoy in an email where its chief executive officer, Dr. Piskun, promised to compensate him in the form of both hourly/per diem fees (the lesser of $500 per hour or $2500 per day) and "an equity ownership package" providing "a very substantial exit" in exchange for consulting services in connection with the design, development, testing, and marketing of the Tissue Retractor.

28. Dr. Kantsevoy accepted that offer immediately and performed fully under the contract, providing LumenR with services such as developing and improving the Tissue Retractor, conducting animal experiments, performing clinical studies, drafting a scientific publication, training physicians in use of Tissue Retractor, and promoting the device. He also paid his own travel costs for LumenR-related business trips, self-funded the clinical trials, and assigned potentially valuable intellectual property rights in several patent applications to LumenR in exchange for a symbolic $1 fee and other "good and valuable consideration" (*i.e.*, an equity interest in LumenR).

29. Nevertheless, LumenR substantially breached the contract by failing to fully pay Dr. Kantsevoy the promised hourly/per diem fee or reimburse his travel costs. Even worse, despite an existing written offer and repeated verbal affirmations, its chief executive officer now denies that he ever promised Dr. Kantsevoy any equity interest in the company.

30. Dr. Kantsevoy has been damaged by this breach because LumenR refuses to compensate him for his substantial investment of time, effort, and money in the development of the Tissue Retractor.

31. Therefore, LumenR should be required to pay all the fees promised in the June 12, 2010 email, reimburse Dr. Kantsevoy for all expenses he incurred on behalf of LumenR, and provide Dr. Kantsevoy with "an equity ownership package" (or equivalent consideration) commensurate with his contributions to the company's success.

## Count II
## Breach of Implied-In-Fact Contract

32. Dr. Kantsevoy incorporates by reference the allegations contained in the preceding paragraphs.

33. Dr. Kantsevoy expected to be compensated by LumenR for his consulting work in the form of both hourly/per diem fees and an "an equity ownership package" because its chief executive officer, Dr. Piskun, sent him an email on June 12, 2010 making that exact promise.

34. There was a meeting of the minds because Dr. Kantsevoy immediately replied to Dr. Piskun's June 12, 2010 email, stating his interest in the technology and acceptance of LumenR's offer. And Dr. Piskun acknowledged Dr. Kantsevoy's acceptance in a June 13, 2010 email. LumenR expected or should have expected to compensate Dr. Kantsevoy as promised because it is axiomatic that businesses pay people for their work.

35. LumenR accepted all Dr. Kantsevoy's work without ever even attempting to pay him for anything but ten training workshops and a handful of animal studies. LumenR also benefited from his efforts to develop and bring the Tissue Retractor to market, to get the medical community to accept the device, and to help attract a potential buyer.

36. Dr. Kantsevoy performed fully under the terms of the implied-in-fact contract, providing LumenR with services such as developing and improving the Tissue Retractor, conducting animal experiments, performing clinical studies, creating videos, drafting scientific presentations and a publication, and promoting the device to members of the business and medical communities at various medical symposiums, training workshops, and other forums around the world. Dr. Kantsevoy also paid his own travel costs for LumenR-related business trips, self-funded the clinical trials, and assigned his intellectual property rights in several patent applications to LumenR.

37. LumenR, however, only paid Dr. Kantsevoy for eight of the twenty-one animal studies he performed—and even then underpaid by $500 on each occasion. It also failed to pay him for any of his other work, did not reimburse him all his travel expenses, or reasonably compensate him for his intellectual property interest in various patent applications. Nor did LumenR provide the promised equity interest in the company.

38. Therefore, LumenR should be required to pay Dr. Kantsevoy full compensation for the work he performed for the company, including a reasonable equity interest in LumenR.

### Count III
### Breach of Implied-In-Law Contract

39. Dr. Kantsevoy incorporates by reference the allegations contained in the preceding paragraphs.

40. Dr. Kantsevoy conferred a benefit on LumenR in the form of the work he provided developing and improving the Tissue Retractor, conducting animal experiments, performing clinical studies, creating videos, drafting scientific presentations and a publication, and promoting the device. Dr. Kantsevoy also paid his own travel costs for LumenR-related

business trips, self-funded the clinical trials, and assigned his intellectual property rights in several patent applications to LumenR.

41. LumenR appreciated that Dr. Kantsevoy's consulting work was providing it a benefit because, *inter alia*, his suggestions radically improved the device's performance to make it functional and then improve it further, and his reputation in the medical community helped the device gain acceptance and attract interest from potential buyers.

42. The retention of this benefit by LumenR without payment of its value would be inequitable because, *inter alia*, Dr. Piskun induced Dr. Kantsevoy to work on the project with a promise of an hourly/per diem fee and an equity interest in the company, and the device likely would have amounted to nothing and/or would have taken substantially longer to develop and commercialize without Dr. Kantsevoy's expert input.

43. Dr. Kantsevoy performed fully under the terms of the implied-in-law contract, providing LumenR with services such as developing and improving the Tissue Retractor, conducting animal experiments, performing clinical studies, creating videos, drafting scientific presentations and a publication, and promoting the device. He also paid his own travel costs for LumenR-related business trips, self-funded the clinical trials, and assigned his intellectual property rights in several patent applications to LumenR.

44. LumenR, however, only paid Dr. Kantsevoy for eight of the twenty-one animal studies he performed—and underpaid on each occasion. It also failed to pay him for any of his other work, reimburse him all his travel expenses or the cost of the human trials, or reasonably compensate him for his intellectual property interest in various patent applications.

45. Therefore, LumenR should be required to pay Dr. Kantsevoy an amount equal to the actual value of the benefit it received from his work on the Tissue Retractor.

## Count IV
## Promissory Estoppel

46. Dr. Kantsevoy incorporates by reference the allegations contained in the preceding paragraphs.

47. LumenR made a clear and definite written promise in its June 12, 2010 email to Dr. Kantsevoy that he would be paid an hourly/per diem fee (the lesser of $500 per hour or $2500 per day) and "an equity ownership package" in exchange for consulting services in connection with the design, development, testing, and marketing of the Tissue Retractor.

48. LumenR had a reasonable expectation that Dr. Kantsevoy would invest time, effort, and money on behalf of LumenR that otherwise could have been spent treating his patients, working on other projects, or enjoying his family.

49. Dr. Kantsevoy did, in fact, spend a good deal of time improving the functionality and efficacy of the LumenR Tissue Retractor and developing intellectual property that protects it, conducting animal experiments, performing clinical studies, creating videos, drafting scientific presentations and a publication, and promoting LumenR's device. He has never been reimbursed for travel costs or the costs of the human clinical trials. Furthermore, on several occasions, Dr. Kantsevoy—to his financial detriment—had to reschedule or cancel clinical appointments of his own patients to accommodate LumenR's priorities.

50. Unless LumenR's promise is enforced, Dr. Kantsevoy will suffer a detriment as a result of his reasonable reliance on that promise because it would leave him uncompensated for the substantial amount of time, effort, and money he invested in developing, testing, marketing, and otherwise commercializing the Tissue Retractor and building the good will of LumenR in the medical community and to potential buyers of the technology.

51. Therefore, to avoid this harm and inequitable result, the promise should be enforced such that LumenR is required (i) to pay Dr. Kantsevoy for all of the services he provided LumenR in accordance with the June 12, 2010 email; (ii) to reimburse him for all expenses he incurred in connection with the design, testing, promotion, and commercial development of the Tissue Retractor; and (iii) to provide him with "an equity ownership package" commensurate with his contributions to the company's success.

### Count V
### Deceit

52. Dr. Kantsevoy incorporates by reference the allegations contained in the preceding paragraphs.

53. To the extent that LumenR never intended to follow through on its chief executive officer's written commitment in 2010 to compensate Dr. Kantsevoy for his consulting services in the form of both hourly/per diem fees and an equity interest in the company, and his subsequent verbal reaffirmations of this commitment, LumenR either knowingly made a false statement to him, or the representation was made with reckless indifference to the truth.

54. LumenR made the representation to induce Dr. Kantsevoy to invest his time, effort, and money in the design, testing, promotion, and commercial development of the Tissue Retractor. To further the objectives of LumenR, Dr. Kantsevoy also paid his own travel costs for LumenR-related business trips and self-funded the clinical studies with the expectation he would be reimbursed according to the agreement reached with LumenR's chief executive officer.

55. Dr. Kantsevoy reasonably relied on the representation because it was similar to those made by other medical device companies in the market.

56. Dr. Kantsevoy has been damaged because, in reliance on LumenR's misrepresentation, he provided the company with services related to the design, testing,

promotion, and commercial development of the Tissue Retractor for which he has not been fully compensated.

57. Therefore, LumenR should be required to pay Dr. Kantsevoy appropriately for his services, according to the actual value of the benefits LumenR received from his work, or the compensation promised in Dr. Piskun's June 12, 2010 email—*i.e.*, the lesser of $500 per hour or $2500 per day and "an equity ownership package" in the company commensurate with Dr. Kantsevoy's contributions to LumenR, along with reimbursement of all expenses Dr. Kantsevoy incurred in connection with the design, testing, promotion, and commercial development of the Tissue Retractor.

## Count VI
## Negligent Misrepresentation

58. In a June 12, 2010 email from its chief executive officer, LumenR negligently promised to compensate Dr. Kantsevoy for his consulting services in the form of both fees and an equity interest in the company, assuming that the precise value of the equity package would be mutually and reasonably agreed upon later.

59. LumenR intended to induce Dr. Kantsevoy to provide services relating to the design, testing, promotion, and commercial development of the Tissue Retractor, and it knew that Dr. Kantsevoy would rely on the statement that, if erroneous, will cause loss or injury because he would (i) expend effort, time, and money helping LumenR develop, test, and promote its device; and (ii) assign valuable intellectual property rights to LumenR.

60. Dr. Kantsevoy reasonably relied on the representation because it was similar to those made by other medical device companies in the market.

61. Dr. Kantsevoy has been damaged because, in reliance on LumenR's misrepresentation, he provided the company with services related to the design, testing, and

promotion of the Tissue Retractor for which he has not been fully compensated and incurred expenses in connection with the design, testing, promotion, and commercial development of the device for which he has never been reimbursed.

62. Therefore, LumenR should be required to pay him fully for his services, the actual value of the benefit it received from his work, or the compensation promised in Dr. Piskun's June 12, 2010 email—*i.e.*, the lesser of $500 per hour or $2500 per day and "an equity ownership package" in the company commensurate with his contributions to the company's success, along with reimbursement of the expenses he incurred in connection with the design, testing, promotion, and commercial development of the Tissue Retractor.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

    a. A Judgment entered against LumenR and for Dr. Kantsevoy on each claim of its complaint;

    b. An Order requiring LumenR to pay to Dr. Kantsevoy compensatory, special, incidental, and punitive damages on the legal claims in the complaint;

    c. An Order requiring LumenR to disgorge to the actual value of Dr. Kantsevoy's contribution to the Tissue Retractor and the resulting increased good will and value of LumenR;

    d. An Order requiring LumenR to pay the fair market value of his consulting service on the equitable claims in the complaints;

    e. An Order requiring LumenR to pay the appropriate pre-judgment or post-judgment interest on any award;

    f. An Order awarding Dr. Kantsevoy costs and reasonable attorneys' fees under applicable law;

    g. An Order piercing the corporate veil; and

    h. An Order awarding such and other further relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

Dated: February 7, 2017  /s/ Jeffrey A. Wolfson
Jeffrey A. Wolfson (Bar. No. 18114)
jeff.wolfson@haynesboone.com
Philip G. Hampton, II (*pro hac vice* pending)
phil.hampton@haynesboone.com
Michael J. Scanlon (*pro hac vice* pending)
michael.scanlon@haynesboone.com
HAYNES AND BOONE, LLP
800 17th Street, NW, Suite 500
Washington, DC 20006
Telephone: (202) 654-4500
Facsimile: (202) 654-4245

*Attorneys for Plaintiff Sergey Kantsevoy, M.D.*