IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SERGEY KANTSEVOY,
*Plaintiff/Counter-Defendant*,

v.                                                          Civil Action No. ELH-17-359

LUMENR LLC,
*Defendant/Counter-Plaintiff.*

**MEMORANDUM OPINION**

Sergey Kantsevoy, M.D., a gastroenterologist, has sued LumenR LLC ("LumenR"), a medical device company, for breach of contract and related claims stemming from Kantsevoy's work in product development for LumenR. ECF 1 (Complaint). LumenR has asserted counterclaims for breach of contract, tortious interference with business relations, and related claims. ECF 12 (Answer and Counterclaims).[1]

Since suit was filed in February 2017, the parties have engaged in the proverbial scorched-earth style of litigation, requiring resolution of numerous discovery disputes and the filing of thousands of pages of vitriolic submissions. Ten motions and cross-motions are pending. This Memorandum Opinion addresses three of them. The first two are cross-motions for judgment on the pleadings under Fed. R. Civ. P. 12(c). ECF 25; ECF 27. LumenR filed its motion first, seeking to dismiss five of Kantsevoy's six claims. ECF 25. The motion is supported by a memorandum of law (ECF 25-1) (collectively, the "LumenR Motion"), and one exhibit. Kantsevoy opposes the LumenR Motion. ECF 26 ("Kantsevoy Opposition"). LumenR replied ("LumenR Reply").

---

[1] Jurisdiction is founded on diversity of citizenship. ECF 1, ¶ 6. Kantsevoy is alleged to be a citizen of Maryland, and LumenR is alleged to be a citizen of Delaware and California. *Id.*

Thereafter, Kantsevoy filed his motion for judgment on the pleadings, seeking to dismiss LumenR's counterclaim for deceit; strike LumenR's affirmative defenses of deceit and promissory estoppel; and strike from LumenR's pleadings "all allegations regarding Dr. Kantsevoy's financial disclosures to third parties." ECF 27. The motion is supported by a memorandum of law (ECF 27-1) (collectively, the "Kantsevoy Motion") and two exhibits. LumenR opposes the Kantsevoy Motion. ECF 29 ("LumenR Opposition"). Kantsevoy replied. ECF 30 ("Kantsevoy Reply").

The third motion addressed in this Memorandum Opinion is LumenR's Motion for Leave to Amend Its Answer, Affirmative Defenses and Counterclaims. ECF 120 ("Motion to Amend"). The Motion to Amend seeks to add a fifth counterclaim, styled "Breach of Contract - Third Party Beneficiary." ECF 120-2 (proposed Amended Answer and Counterclaims) at 20. Kantsevoy opposes the Motion to Amend. ECF 144. LumenR replied. ECF 158.

No hearing is necessary to resolve these three motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion to Amend. And, I shall grant the LumenR Motion and the Kantsevoy Motion in part and deny each in part.

## I.    Factual Background

Given the procedural posture of this case, I must assume the truth of all factual allegations in the Complaint. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). Because both parties have filed motions for judgment on the pleadings under Rule 12(c), I shall include the factual allegations in Kantsevoy's Complaint as well as LumenR's Answer and Counterclaims, noting where they conflict. Additionally, where relevant facts are contained in exhibits incorporated into the pleadings (discussed, *infra*), I shall refer to those exhibits, as well.

In 2009, LumenR was founded by Gregory Piskun, M.D. ECF 1, ¶ 9. The company focused on developing a medical device that would aid in surgery to remove cancerous lesions and tumors from the colon, stomach, and esophagus. *Id.* The device is called the LumenR Tissue Retractor System ("Tissue Retractor"). *Id.* In May 2010, Piskun approached Kantsevoy at a convention to discuss the Tissue Retractor, and Kantsevoy said that the device could be useful. *Id.* ¶¶ 10-11.

Kantsevoy describes himself as "an internationally known gastroenterologist," practicing at Mercy Hospital in Baltimore. ECF 1, ¶ 4. He claims that on June 12, 2010, Piskun "invited Dr. Kantsevoy to formally join the [LumenR] development team." *Id.* ¶ 12. Kantsevoy alleges that Piskun made an "offer" that "included a promise to pay Dr. Kantsevoy the lesser of $500 per hour or $2500 per day for his consulting services." *Id.* Kantsevoy insists that the "offer" "also included a promise to 'create an equity ownership package'" for Kantsevoy, by which "[t]he parties understood that LumenR would provide Dr. Kantsevoy a reasonable equity package [in LumenR], the precise amount of which would be mutually and reasonably agreed upon later." *Id.* Kantsevoy alleges that he "accepted the offer that day," and the next day "Dr. Piskun acknowledged in writing that Dr. Kantsevoy accepted the offer to work for LumenR." *Id.*

LumenR alleges a somewhat different story. LumenR agrees that Piskun and Kantsevoy met in May 2010, but alleges that in June, Piskun "sent an email to Kantsevoy inquiring regarding Kantsevoy's interest in consulting on the LumenR project." ECF 12, ¶ 9. The email, dated June 12, 2010, stated, ECF 25-2:

> Sergey - Thank you, It is an honor to get you involved. Let's start by introducing the technology to you?
> If this is acceptable to you we would compensate your consulting time with $500/hour and $2500/day if need to spend a day on the company's business (meetings, labs, clinical studies, etc.) If it happens that you really [sic] excited

about the technology and believe in its future, we can create an equity ownership package which may be a very substantial exit for you.

Please let me know your thoughts. If you prefer to talk on the phone please don't hesitate to call me at [REDACTED].

Best Regards,
Greg

Kantsevoy replied: "Yes, I am interested. We can discuss more details by e-mail or by phone - both way [sic] are good for me. Sergey." ECF 25-2. LumenR asserts that there were "no further communications on the topic of Kantsevoy's potential consulting arrangement until nearly a year later." ECF 12, ¶ 9.

LumenR claims that when Kantsevoy and Piskun met again in June 2011, Kantsevoy expressed interest in the Tissue Retractor. *Id.* ¶ 10. LumenR alleges that in September 2011, Piskun and Kantsevoy executed an agreement as to a *different* project, concerning the "HET" project ("HET Agreement"), not associated with LumenR, but also supervised by Piskun. *Id.* ¶ 11. The HET Agreement specified that Kantsevoy would receive $500 for each product evaluation form he submitted and a $2,000 honorarium for any speaking engagement he attended on behalf of the HET project. *Id.* The HET Agreement also provided equity compensation to Kantsevoy of 50,000 shares. *Id.* In addition, the HET Agreement contained a confidentiality provision and a requirement that Kantsevoy assign to HET any intellectual property rights obtained in the course of the HET project. *Id.*

According to LumenR, Piskun's email forwarding the HET Agreement stated that "we will create the identical agreement for LumenR when ready to execute." *Id.* (internal quotation

marks omitted).[2] LumenR asserts that Kantsevoy executed the HET Agreement, but then later asked to rescind it. *Id.* Although the HET Agreement was rescinded on an unspecified date, LumenR alleges that Kantsevoy still wished to consult for LumenR on the Tissue Retractor, and Kantsevoy suggested lowering his per diem rate to $2,000. *Id.* ¶ 12.

LumenR maintains that when LumenR's patent application for the Tissue Retractor was filed, at an unspecified time, Kantsevoy was named as a co-inventor, but he assigned all his rights in the product to a corporation called "Macroplata, Inc.," and his rights were subsequently assigned to LumenR. *Id.* ¶ 16. Kantsevoy states that he signed away his intellectual property rights, "for a symbolic fee of $1 and 'other good and valuable consideration,'" which Kantsevoy alleges was understood to include an "'equity ownership package'" in LumenR. ECF 1, ¶ 18.

According to LumenR, between February 2012 and November 2013, Kantsevoy conducted several tests of the Tissue Retractor on animals and received seven payments from LumenR at his per diem rate. ECF 12, ¶ 17. Further, LumenR maintains that Kantsevoy "expressed interest in conducting human clinical trials" with the Tissue Retractor, but that he "insisted on not being compensated by LumenR as this would allow him to publish peer reviewed articles, and participate in seminars and speaking engagements while being free of financial conflicts of interest." *Id.* ¶ 18.

LumenR alleges that it "agreed to have Kantsevoy self-sponsor clinical work," and "support[ed] Kantsevoy's efforts" with sample devices, technical support, and selective reimbursements. *Id.* ¶ 19. In "exchange" for this support, Kantsevoy was expected to "provide copies of the completed clinical trial data sheets to LumenR and to publish the results of his

---

[2] In subsequent submissions, LumenR has clarified that the email, sent June 14, 2011, forwarded an early draft of the HET Agreement and not the final version, which was sent in September 2011. ECF 28 at 8 n.3.

work." *Id.* LumenR alleges that Kantsevoy never provided the clinical trial data sheets. *Id.* Further, LumenR insists that throughout Kantsevoy's clinical work, Kantsevoy continually "represented to LumenR, to peer reviewed publications, to professional organizations and . . . to the [Institutional Review Board] of Mercy Hospital, that Kantsevoy had no relevant financial disclosures and no financial conflicts." *Id.* ¶ 20. LumenR asserts that it believed these representations to be true. *Id.*

Only in April of 2016, LumenR maintains, did Kantsevoy begin "making unwarranted, unjustified and highly unethical demands for substantial retroactive payment, including company equity." *Id.* ¶ 21. LumenR contends that it attempted to negotiate a contract with Kantsevoy, but Kantsevoy repeatedly "escalat[ed] his demands." *Id.* ¶ 22.

For his part, Kantsevoy asserts that he "invested time and effort into marketing the Tissue Retractor," in addition to publishing an academic paper describing his animal testing and making 36 presentations about the technology. ECF 1, ¶ 19. He contends that he "would not have exerted such substantial efforts had he not been promised 'an equity ownership package' in the Tissue Retractor." *Id.*

In addition, Kantsevoy alleges that he was not paid for his work in accordance with the June 2010 "agreement," but was instead underpaid. *Id.* ¶ 21. In particular, he asserts that he was paid only for ten workshops, and for only eight of 21 animal experiments he conducted. *Id.* Plaintiff also alleges that when LumenR paid him for the eight experiments, "it underpaid Dr. Kantsevoy by $500 each time." *Id.* Further, plaintiff contends that he has not been paid for other substantial contributions, and that he was not fully reimbursed for travel costs. *Id.*

Notably, Kantsevoy asserts that during the working relationship, Piskun "repeatedly assured him that LumenR would adequately compensate Dr. Kantsevoy for his time and efforts."

*Id.* ¶ 13.  Kantsevoy cites two occasions, in 2015 and 2016, on which Piskun "confirmed that Dr. Kantsevoy would be provided an equity stake in LumenR," but that "the exact value of that interest would have to wait for the sale of the technology."  *Id.*  Since that time, however, Kantsevoy alleges that Piskun and LumenR have "disavowed" their "repeated offers of an equity stake in the company and, instead, proposed to compensate Dr. Kantsevoy in the form of vague promises that [another company] would fund Dr. Kantsevoy's future research or sponsor his scientific conferences." *Id.* ¶ 23.

In contrast, LumenR asserts that Kantsevoy threatened to "'destroy' LumenR to his professional colleagues" if his demands were not met, and further threatened to destroy or compromise the data he had collected during his clinical trials.  ECF 12, ¶ 25.  LumenR alleges that Kantsevoy in fact carried out one of his threats by removing the Tissue Retractor from a previously announced showcase, thereby "casting the product in an unjustified negative light." *Id.* ¶ 26.

Finally, LumenR contends that from July 2016 to November 2016, after Kantsevoy discovered that LumenR was in talks with a third party about selling the rights to the Tissue Restractor, Kantsevoy disparaged LumenR to one or more employees of that third party and claimed that he had an interest in the company, so as to discourage the third party from completing the purchase.  *Id.* ¶ 27.  Kantsevoy alleges that the third party, Boston Scientific Corporation ("BSC"), purchased the rights to the Tissue Retractor for approximately $40 million.  ECF 1, ¶ 25.  However, LumenR asserts that "Kantsevoy's interference with [BSC] diminished the value" of the ultimate sale.  ECF 12, ¶ 28.

This suit followed in February 2017.  ECF 1.  Additional facts are included in the Discussion.

## II.    Motion to Amend

### A.

As noted, suit was filed in February 2017.  LumenR initially answered Kantsevoy's Complaint and counterclaimed on February 28, 2017.  ECF 12.  The Court issued a Scheduling Order on March 23, 2017.  ECF 23.  It set a deadline of May 24, 2017, for joinder of additional parties and amendment of pleadings.  *Id.* at 1.  A deadline of October 23, 2017, was set for completion of discovery, and the dispositive pretrial motions deadline was set for November 20, 2017.  *Id.* at 2.

On July 18, 2017, at the parties' request (ECF 45), the Court modified the Scheduling Order, extending various deadlines for expert disclosures, and extending the discovery deadline until November 15, 2017.  ECF 47.  At the eleventh hour, on the last day of discovery, the parties moved to extend discovery until December 1, 2017, and to extend the deadline for dispositive pretrial motions from November 20, 2017, until December 6, 2017.  ECF 97.  This request was also granted.  ECF 98.  Finally, on December 8, 2017, the parties moved to extend retroactively the discovery deadline by one day, to allow for the completion of their last deposition.  ECF 118. The Court granted this motion.  ECF 119.

LumenR moved to amend its Answer and Counterclaims on December 12, 2017.  ECF 120.  That motion was filed ten days after the close of the discovery period that had been extended three times, six days after the deadline for dispositive motions, and about six months beyond the deadline for amendment of pleadings.  In particular, LumenR seeks to add a counterclaim for Breach of Contract - Third Party Beneficiary.  ECF 120-2 at 20-21.

The proposed counterclaim alleges that Kantsevoy breached a contract by refusing to release to LumenR the data he collected in his human clinical trials.  *Id.*  The "contract,"

however, is alleged to be an informed consent form that Kantsevoy provided to the subjects of his clinical trial. ECF 120-2, ¶ 42. The consent form stated, *inter alia*, that "Mercy Medical Center and/or its outside partners in this research will own these data." *Id.* ¶ 43. LumenR alleges that it was the only "outside partner" involved in the research and therefore, according to the consent form, it owns the data. *Id.* ¶ 45. Although LumenR was not a party to the consent form, it claims that it was a third-party beneficiary to the agreement, and therefore it can enforce the clause of the consent form against Kantsevoy. ECF 120-1 at 2.

In Kantsevoy's opposition to the Motion to Amend (ECF 144), he points out that LumenR did not move to amend its pleadings until long after the deadline of May 24, 2017, that this Court set for doing so (*see* ECF 23), and he argues that LumenR's belated amendment fails Fed. R. Civ. P. 16's "good cause" standard for modifying a scheduling order. ECF 144 at 18. Kantsevoy asserts that "LumenR's counsel knew all the facts necessary to bring [the new counterclaim] long before the deadline," but declined to do so until after the close of discovery and the pretrial motions deadline. *Id.* at 19-20. Kantsevoy further contends that allowing the amendment will prejudice him, as he would have no opportunity to conduct further discovery regarding the new claim. *Id.* at 20. In the alternative, Kantsevoy argues that the Court should deny leave to amend under Fed. R. Civ. P. 15, because the amendment is futile and would cause undue prejudice to Kantsevoy. *Id.* at 22-30.

In its defense, LumenR asserts that "the relevant facts were not fully known by LumenR until well after the deadline of May 24, 2017 had passed." ECF 120-1 at 1. In particular, LumenR cites the deposition of a representative of Mercy Medical Center, taken on July 19, 2017; the deposition of Kantsevoy himself, taken on November 11, 2017; and the deposition of Kantsevoy's expert, taken on December 2, 2017, as confirming that "no other 'outside partners'

other than LumenR were involved in the clinical trial of the LumenR device." *Id.* at 2. Thus, LumenR maintains that the counterclaim "was not fully developed by LumenR until nearly the close of discovery." ECF 158 at 7.

## B.

A complaint may be amended "once as a matter of course" within twenty-one days of service of a defendant's answer or Rule 12(b), (e), or (f) motion, "whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, the court "should freely give leave when justice so requires." *Id.*

At this juncture, however, LumenR must do more than satisfy the liberal standard for amendments set forth in Fed. R. Civ. P. 15(a). When, as here, a party seeks to amend a pleading after the expiration of a deadline set forth in a scheduling order, Rule 16(b)(4) is implicated. Rule 16(b)(4) states that a scheduling order may be modified to amend a pleading "only for good cause and with the judge's consent."

LumenR must first meet the requirements of Fed. R. Civ. P. 16(b)(4). "[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings." *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *see also Cook v. Howard*, 484 F. App'x 805, 814-15 (4th Cir. 2012) (per curiam) ("[U]nder Rule 16(b)(4), a party must first demonstrate 'good cause' to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment."); *Humane Soc'y of the U.S. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, DKC-13-1822, 2016 WL 3668028, at *2 (D. Md. July 11, 2016) (hereinafter, "*Humane Society*") ("Plaintiffs must do more than satisfy the liberal standard of Fed. R. Civ. P. 15(a); they must first meet the mandates of Fed. R.

-10-

Civ. P. 16(b)(4) . . . .”); *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 519-20 (Bankr. D. Md. 2014) (applying a two-prong test under Rules 16(b)(4) and 15(a) in analyzing an untimely motion for leave to amend).

The "burden for demonstrating good cause rests on the moving party." *United States v. Hartford Accident & Indemnity Co.*, JKB-14-2148, 2016 WL 386218, at *5 (D. Md. Feb. 2, 2016). In order to demonstrate good cause, the party seeking relief must "'show that the deadlines cannot reasonably be met despite the party's diligence,' and whatever other factors are also considered, 'the good-cause standard will not be satisfied if the [district] court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule.'" *Cook*, 484 F. App'x at 815 (alterations in *Cook*) (quoting 6A Charles Allen Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1522.2 (3d ed. 2010)).

In determining whether the moving party has met its burden to show good cause, a court may consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Elat*, 993 F. Supp. 2d at 520 (citing *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768-69 (Bankr. D. Md. 2010)). If the movant "'was not diligent, the inquiry should end.'" *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) (quoting *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D. W. Va. 1995)) (emphasis omitted); *see, e.g.*, *CBX Techs., Inc. v. GCC Techs., LLC*, JKB-10-2112, 2012 WL 3038639, at *4 (D. Md. July 24, 2012) (denying motion to amend the complaint because the plaintiff's "failure to anticipate" its needs was "of its own doing and not the fault of any other entity"), *aff'd*, 533 F. App'x 182 (4th Cir. 2013) (per curiam).

Of relevance here, when a movant fails to satisfy Rule 16(b), the court need not consider Rule 15(a). In *Nourison*, 535 F.3d at 299, the Fourth Circuit said: "Because we sustain the

District Court's application of Rule 16(b), there is no cause for us to address the Court's finding that amendment would be futile, which is a Rule 15(a) consideration." *See also Humane Society*, 2016 WL 3668028, at *6 ("Because Plaintiffs lack good cause for modifying the scheduling order under Rule 16(b), their remaining arguments in support of leave to amend under Rule 15 need not be considered."); *Marcum*, 163 F.R.D. at 254 ("'[T]he focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.'" (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992))).

If the movant shows good cause for modification of the scheduling order, the inquiry shifts to Rule 15(a). Rule 15(a)(2) states: "[A] party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." *See also Foman v. Davis*, 371 U.S. 178, 182 (1962); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 769 (4th Cir. 2011). Under Rule 15(a), the district court has "broad discretion concerning motions to amend pleadings." *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam); *see also Foman*, 371 U.S. at 182; *Laber v. Harvey*, 438 F.3d 404, 426-29 (4th Cir. 2006) (en banc). A district court may deny a motion to amend for reasons "'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment.'" *Booth*, 337 F. App'x at 312 (quoting *Foman*, 371 U.S. at 182).

Rule 16(b)(4) may appear at odds with Rule 15(a)(2). The Fourth Circuit explained in *Nourison*, 535 F.3d at 298:

> There is tension within the Federal Rules of Civil Procedure between Rule 15(a) and Rule 16(b) . . . . Rule 15(a) provides that leave to amend "shall be

freely given when justice so requires." A motion to amend should be denied only where it would be prejudicial, there has been bad faith, or the amendment would be futile. *HCMF Corp. v. Allen*, 238 F.3d 273, 276-77 (4th Cir. 2001). On the other hand, Rule 16(b) provides that "a schedule shall not be modified except upon a showing of good cause and by leave of the district judge."

\* \* \*

Given their heavy case loads, district courts require the effective case management tools provided by Rule 16.

With this framework, I turn to analyze the rules as they apply here.

## C.

In its Motion to Amend, LumenR merely gestures at the "good cause" standard of Rule 16(b). It states, ECF 120-1 at 3: "Here, there can be no real question that good cause exists to move the Court to permit LumenR to amend its Answer after the scheduling order deadline has passed because, as stated above, the relevant facts were not fully developed until late in 2017." LumenR then moves on to discuss the more liberal standard of Rule 15(a). *Id.*

Kantsevoy responds, emphasizing that "Rule 16 does not allow parties to sit back until their claims are fully proven; rather, it requires them to take action as soon as they have notice of the facts necessary to assert a claim." ECF 144 at 21. According to Kantsevoy, LumenR "knew all the facts necessary to assert it proposed contract claim by the February 28, 2017 filing of its original counterclaims. *Id.* at 19.

Indeed, LumenR admits in its reply that it "had knowledge of the language of the informed consent forms at this earlier time." ECF 158 at 7. Still, LumenR contends that because the claim was not "fully developed" until "nearly the close of discovery," good cause exists to grant leave to amend. *Id.*

I agree with Kantsevoy. By all accounts, LumenR was aware of the "core operative facts" of its proposed counterclaim before the deadline to amend the pleadings had passed, and "the fact that [LumenR] may not have had sufficient evidence to *prove* [its] claim before the

deadline for the amendment of pleadings had no bearing on his ability to *plead* [its] claim in a timely manner." *Crouch v. City of Hyattsville, Md.*, DKC-09-2544, 2012 WL 718849, at *2-3 (D. Md. Mar. 5, 2012) (emphasis added) (internal quotation marks omitted). This suggests a lack of diligence on LumenR's part, and diligence is the focus of the Rule 16(b) inquiry. *Marcum*, 163 F.R.D. at 254.

LumenR discusses the "good cause" standard more thoroughly in its reply (ECF 158), but it offers little in the way of justification for its tardiness. It asserts that "although LumenR had been aware of the informed consent form at the time of the deadline to amend the pleadings, it was not until its deposition of Mercy on July 19, 2017, when Mercy disclaimed any ownership in the clinical trial data, that LumenR first appreciated the potential counterclaim." *Id.* at 9.

This statement works against LumenR's ultimate goal in two ways. First, the fact that LumenR had not previously "appreciated" its potential counterclaim, despite having knowledge of the document that purportedly gave rise to it, does not support its claim of diligence. "Courts in the Fourth Circuit deny leave to amend a complaint past the deadline established by a scheduling order where the moving party has been careless in developing his claims or where he has failed to satisfactorily account for his failure to do so." *Tawwaab*, 729 F. Supp. 2d at 769.

Second, and perhaps more important, July 19, 2017, was almost five months prior to the filing of the Motion to Amend on December 12, 2017. If, following the deposition on July 19, 2017, LumenR finally "appreciated" its potential counterclaim, it has not adequately explained why it waited five months before moving to amend. Rather, it contends that its delay is justified by its eventual confirmation in November 2017 that there were no other "outside partners" involved in the research, and by information obtained from Kantsevoy's expert, Dr. Paresh Shah, on December 2, 2017. ECF 158 at 9. At that time, LumenR learned that Dr. Shah "would not

view Kantsevoy, an employee of Mercy, as being an 'outside partner' of Mercy." *Id.* LumenR does not explain why the opinion of its opposing party's expert on this question was the final element LumenR needed to plausibly plead its counterclaim.

There is an important difference between modifying the Court's Scheduling Order shortly after the deadline to amend the pleadings has passed, and modifying it some six months later, after the close of discovery and the deadline to submit dispositive pretrial motions. *See Crouch*, 2012 WL 718849, at *2 n.4 ("Permitting Plaintiff to amend his complaint at this point in the proceedings would require not only that the deadline for the amendment of pleadings be modified, but likely that other deadlines be modified as well to accommodate additional discovery concerning any new claims."); *see also Brown v. Target, Inc.*, ELH-14-0950, 2016 WL 4443872, at *7-8 (D. Md. Aug. 18, 2016) (denying leave to amend where plaintiff should have known of a new claim at least two months earlier, but only sought to add the claim after the close of discovery).

I conclude that LumenR has failed to show good cause under Rule 16(b) to modify the Scheduling Order. Therefore, I need not consider the propriety of amendment under Rule 15(a). Accordingly, I shall deny the Motion to Amend. ECF 120.

### III.  Motions for Judgment on the Pleadings

### A.  Legal Standard

LumenR and Kantsevoy have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). A Rule 12(c) motion "for judgment on the pleadings" may be filed "[a]fter the pleadings are closed," so long as it is "early enough not to delay trial." Fed. R. Civ. P. 12(c). Under Rule 12(h)(2)(B), a party may assert "[f]ailure to state a claim upon which relief can be granted" in a Rule 12(c) motion. Such a motion is "assessed under the same standard that

applies to a Rule 12(b)(6) motion." *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)); *see also McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013).

A party may test the legal sufficiency of a complaint or counterclaim by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney*, 616 F.3d at 408; *Edwards*, 178 F.3d at 243. A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citation and internal quotation marks omitted).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim

asserted." *Johnson v. City of Shelby, Miss.*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (citation and internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations and internal quotation marks omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

## B. Exhibits

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the

plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Kantsevoy did not attach any exhibits to his Complaint, and LumenR did not attach any exhibits to its Answer and Counterclaims. However, both parties submitted exhibits with their motions for judgment on the pleadings. LumenR attached an email exchange between Piskun and Kantsevoy, dated June 12, 2010. ECF 25-2 ("June 12, 2010 Email"). Kantsevoy attached two exhibits to the Kantsevoy Motion: a copy of the HET Agreement (ECF 27-3), and an email from Piskun to Kantsevoy, dated September 1, 2011, discussing Kantsevoy's proposed compensation with regard to the HET Agreement. ECF 27-4. Kantsevoy also attached the September 1, 2011 email and the HET Agreement to the Kantsevoy Opposition. ECF 26-1, ECF 26-2. LumenR attached a different email from Piskun to Kantsevoy, dated June 14, 2011, to the LumenR Reply. ECF 28-1. That email pertains to an earlier draft of the HET Agreement. Kantsevoy attached an article, published in connection with his clinical trials of the HET technology, to the Kantsevoy Reply. ECF 30-1.

In my view, the June 12, 2010 Email (ECF 25-2) is incorporated into both the Complaint and the Answer and Counterclaims, because it is referenced repeatedly, and it appears to be the basis of the Complaint. *See, e.g.*, ECF 1, ¶ 1; ECF 12, ¶ 9. Likewise, I regard the HET Agreement (ECF 27-3) as incorporated by reference into LumenR's Answer and Counterclaims. *See, e.g.*, ECF 12, ¶ 11. And, the email of June 14, 2011, at ECF 28-1, is also incorporated into LumenR's Answer and Counterclaims. *See* ECF 12, ¶ 11.

I consider the other exhibits—the September 11, 2011 email, at ECF 27-4, and Kantsevoy's published article, at ECF 30-1—to be submitted as evidence, rather than as documents foundational to the Complaint. As such, they are inappropriate to consider in

connection with a motion to dismiss. *See Zak*, 780 F.3d at 606 ("Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment.").

## C.  Choice of Law

Jurisdiction is founded on diversity of citizenship.  ECF 1, ¶ 6.  Both parties assume, without discussion, that Maryland law applies.  *See* ECF 25-1 at 8; ECF 27-1 at 12.  "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state."  *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see also Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (per curiam); *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).  Maryland is, of course, the forum state.

As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g., Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014).  Kantsevoy alleges that he entered into the contract while in Maryland.  ECF 1, ¶ 8.  Although LumenR disputes the allegation that a contract was ever formed, it does not dispute the application of Maryland law.  *See* ECF 12, ¶¶ 4-5.  Therefore, I shall apply Maryland law.

## D.  Principles of Contract Construction

Because both parties allege claims founded in contracts, it is helpful to review the principles of contract formation and contract interpretation under Maryland law.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2-3 (4th ed. 1990) (internal quotation marks omitted) (quoting Restatement (Second) Contracts § 1 (1981)); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22 (2006), *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

"In determining whether there was an enforceable contract, [courts] began [the] analysis by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in

writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Servs.*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 50-51 (2002); *see L & L Corp. v. Ammendale Normal Inst.*, 248 Md. 380, 385, 236 A.2d 734, 737 (1968); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1957) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 334-35 (2017) (citation and internal quotation marks omitted); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am. N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). This includes the determination of whether a contract is ambiguous. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (alteration omitted) (quoting *Tomran, Inc. v. Passano*, 391 Md. 1, 14, 891 A.2d 336, 344

(2006)).  To determine the parties' intentions, courts look first to the written language of the contract.  *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("Generally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'"  *Urban Growth Prop. Ltd. P'ship v. One W. Baltimore St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014).  The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement."  *Dumbarton*, 434 Md. at 52, 73 A.3d at 232.  Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'"  *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

As indicated, to determine the parties' intentions, courts first look to the written language of the contract.  *See Walton*, 391 Md. at 660, 894 A.2d at 594.  "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which

they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51-52, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656-57, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brendsel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) (applying West Virginia law and stating that the court "will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (Bankr. D. Md. 2015) (quoting *Kumar v. Dhanda,* 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation."

*Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

## IV.    LumenR Motion

### A.  Overview of Kantsevoy's Claims

As discussed, Kantsevoy alleges that he formed a contract with LumenR on June 12, 2010. On that date, Piskun, on behalf of LumenR, emailed an "offer" to Kantsevoy promising daily or hourly compensation and "'an equity ownership package' providing 'a very substantial exit.'" ECF 1, ¶ 27. And, Kantsevoy alleges that he "accepted that offer immediately and performed fully under the contract." *Id.* ¶ 28. According to Kantsevoy, LumenR (through Piskun) reaffirmed its intention to grant Kantsevoy an equity package on multiple occasions. *Id.* ¶ 13. As a result of this agreement, and in reliance on the expectation of cash and equity, Kantsevoy allegedly dedicated his time and expertise to improving and promoting the medical device. *Id.* ¶ 16-17.

Kantsevoy further asserts that LumenR failed to compensate him properly, both by reducing or refusing to pay him the agreed-upon consulting fees, and by reneging on its promise of an equity interest in LumenR. *Id.* ¶¶ 21-23. Therefore, Kantsevoy demands "all the fees" promised in the June 12, 2010 Email, reimbursement for all expenses that he incurred on behalf of LumenR, and "'an equity ownership package' (or equivalent consideration) commensurate with his contributions to the company's success." *Id.* ¶ 31.

The LumenR Motion does not dispute the allegations underlying the alleged "breach." Instead, LumenR argues that no contract was formed because, rather than constituting a definite offer, Piskun's June 12, 2010 Email was merely an "invitation to engage in a future negotiation." ECF 25-1 at 9. As noted, the June 12, 2010 Email stated, ECF 25-2:

> Sergey - Thank you, It is an honor to get you involved. Let's start by introducing the technology to you?
> If this is acceptable to you we would compensate your consulting time with $500/hour and $2500/day if need to spend a day on the company's business (meetings, labs, clinical studies, etc.) If it happens that you really excited about the technology and believe in its future, we can create an equity ownership package which may be a very substantial exit for you.
>
> Please let me know your thoughts. If you prefer to talk on the phone please don't hesitate to call me at [REDACTED].
>
> Best Regards,
> Greg

And, Kantsevoy responded, *id.*: "Yes, I am interested. We can discuss more details by e-mail or by phone - both way [sic] are good for me. Sergey."

According to LumenR, this exchange did not create "an enforceable promise." ECF 25-1 at 8. LumenR asserts that material terms are missing from the exchange, such as the terms of the "equity ownership package." *Id.* at 10. Thus, LumenR maintains that Kantsevoy's allegations do not state a claim for breach of express contract (*id.*), breach of implied-in-fact contract (*id.* at

10-11), or promissory estoppel. *Id.* at 12-13. Likewise, LumenR argues that because the June 12, 2010 Email contains no "false representation," Kantsevoy cannot state a claim for deceit or negligent misrepresentation, either. *Id.* at 13-16.

This basic framework of allegations—a promise made, work done, a promise broken— underlies all six of Kantsevoy's claims against LumenR. And, LumenR's argument for dismissal—no promise was made—underlies each part of the LumenR Motion. All of the claims rest on the same logic. I shall divide the discussion of Kantsevoy's claims into two parts: (1) his claim for monetary compensation of $500 per hour or $2,500 per day, and (2) his claim for an "equity ownership package."

## B. Elements of Kantsevoy's Claims

As indicated, LumenR has moved to dismiss Counts I, II, IV, V, and VI of Kantsevoy's Complaint. ECF 25. These counts allege Breach of Express Contract (Count I), Breach of Implied-In-Fact Contract (Count II), Promissory Estoppel (Count IV), Deceit (Count V), and Negligent Misrepresentation (Count VI). *See* ECF 1. LumenR does not move to dismiss Kantsevoy's Count III, for Breach of Implied-In-Law Contract, *i.e.*, unjust enrichment.

Before discussing the specifics of these claims, it is helpful to define each of them.

### 1. Contract-Based Claims

The Maryland Court of Appeals has amply explained the distinctions between an "express contract," a "contract implied-in-fact," and a "contract implied-in-law," as well as the elements of a claim for "promissory estoppel."

"'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit

language, either orally or in writing.'" *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688 (quoting *Dashiell*, 358 Md. at 94, 747 A.2d at 606).

Kantsevoy's other contract claims are at least loosely based in the doctrine of quantum meruit, although neither party uses the term. "The Latin term *quantum meruit* means 'as much as deserved.'" *Mogavero*, 142 Md. App. at 274, 790 A.2d at 51 (quoting *Black's Law Dictionary* 1243 (6th ed. 1990)); *see also Blanton v. Friedberg*, 819 F.2d 489, 492 (4th Cir. 1987) (construing South Carolina law and stating: "'The impact of quantum meruit is to allow a promisee to recover the value of services he gave to the defendant irrespective of whether he would have lost money on the contract and been unable to recover in a suit on the contract.'") (citation omitted); *First Union Nat'l Bank v. Meyer, Faller, Weisman, & Rosenberg, P.C.*, 125 Md. App. 1, 23, 723 A.2d 899 (1999) ("'By its terms, quantum meruit is a method of obtaining a reasonable value for services . . . .'" (Citation omitted)) .

The Fourth Circuit explained in *W.F. Magann Corp. v. Diamond Manufacturing Co.*, 775 F.2d 1202, 1208 (4th Cir. 1985) (quoting 5 *Corbin on Contracts* § 1109) (construing South Carolina Law):

> "One who has rendered a service or supplied work, labor and materials under a contract with another, but who has been wrongfully discharged or otherwise prevented from so fully performing as to earn the agreed compensation, may regard the contract as terminated and get judgment for the reasonable value of all that the defendant has received in performance of the contract."
>
> * * *
>
> The underlying purpose of allowing *quantum meruit* recovery is two-fold, i.e. to prevent the breaching party from being unjustly enriched and to restore the aggrieved party in the contract to the position he occupied prior to entry into the contract. *Quantum meruit* merely seeks to return to the plaintiff the reasonable value of the services and goods provided to the defendant.

Under Maryland law, a claim for quantum meruit may be based on a contract implied in fact or a contract implied by law, which is often referred to as unjust enrichment. The Fourth

Circuit explained in *Sanders v. Mueller*, 133 F. App'x 37, 42 n.3 (4th Cir. 2005): "Maryland law distinguishes between two types of quantum meruit claims, one based on an implied-in-fact contract (usually designated as quantum meruit) and the other based on an implied-in-law contract (usually designated as unjust enrichment)." *See also Mogavero*, 142 Md. App. at 274-75, 790 A.2d at 52. These terms have "distinct meanings." *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6; *see Alternatives Unlimited, Inc. v. New Baltimore City Board of School Comm'rs*, 155 Md. App. 415, 480-82, 843 A.2d 252, 290-91 (2004); *Mohiuddin v. Doctors Billing & Management Solutions, Inc.* 196 Md. App. 439, 447, 9 A.3d 859, 864 (2010).

A contract implied-in-fact, or an "implied contract," is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Dashiell*, 358 Md. at 94, 747 A.2d at 606 (citation and internal quotation marks omitted). Maryland courts have said that an implied-in-fact contract arises when "specific services are requested by the defendant." *Mogavero*, 142 Md. App. at 281, 790 A.2d at 55. An implied-in-fact contract "is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'" *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted). As noted, "'The services must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and that the recipient expected, or should have expected, to pay for them.'" *Mogavero*, 142 Md. App. at 277, 142 A.2d at 53 (citation omitted). "Recovery on a contract implied in fact . . . is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services." *Id.* at 276, 790 A.2d at 53.

An implied-in-fact contract "'refers to that class of obligations which arises from *mutual agreement and intent to promise*, when the agreement and promise have simply not been expressed in words. Despite the fact that no words of promise or agreement have been used, such transactions are nevertheless true contracts, and may properly be called inferred contracts or contracts implied in fact.'" *Mohiuddin*, 196 Md. App. at 448, 9 A.3d at 865 (quoting *Williston on Contracts* § 1.5 (1990)) (emphasis in *Mohiuddin*); *see also Dashiell*, 358 Md. at 94, 747 A.2d at 606 ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.") (internal quotation and citations omitted); *Slick v. Reinecker*, 154 Md. App. 312, 318, 839 A.2d 784, 787 (2003) ("'The term implied in fact contract only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'") (alterations omitted) (quoting *Mass Transit Admin. v. Granite Construction Co.*, 57 Md. App. 766, 774, 471 A.2d 1121 (1984)); *Mogavero*, 142 Md. App. at 275, 790 A.2d at 52 ("An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'"). An implied-in-fact contract is proven by circumstantial evidence. *Slick*, 154 Md. App. at 318, 839 A.2d at 787.

In contrast to express and implied-in-fact contracts, a contract implied-in-law, also known as a "quasi-contract" or unjust enrichment, is a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Maryland Cas. Co.*, 442 Md. at 707, 114 A.2d at 689 (emphasis and citations omitted); *see Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 ("A contract implied by law is now what commonly is called quasi-contract . . . ."); *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at

865. However, "'unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. *They are obligations created by law for reasons of justice.*'" *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (citation omitted) (emphasis in *Mohiuddin*).

Thus, "[i]n Maryland, a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties." *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) (citation and internal quotation marks omitted); *Dashiell*, 358 Md. at 101, 747 A.2d at 610 ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists."); *see also FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."). Accordingly, "[t]he measure of damages in an unjust enrichment claim is the value of the goods or services rendered by the plaintiff in the hands of the defendant." *Maryland Cas. Co.*, 442 Md. at 709, 114 A.3d at 690 (citing *Mogavero*, 142 Md. App. at 276, 790 A.2d at 53).

In *Dolan v. McQuaide*, 215 Md. App. 24, 37, 79 A.3d 394, 402 (2013), the Maryland Court of Special Appeals wrote (emphasis in original): "This taxonomy can be summed up, as follows: 1) an express contract arises from *verbal* [or written] communication of *definite terms;* 2) a contract implied-in-fact arises from *actions* implying *definite terms;* and 3) unjust enrichment arises from *actions* that do *not* imply *definite terms.*"

Promissory estoppel "is an alternative means of obtaining contractual relief." *Maryland Transp. Auth. Police Lodge #34 of the Fraternal Order of Police, Inc. v. Maryland Transp.*

*Auth.*, 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010), *rev'd on other grounds*, 420 Md. 141, 21 A.3d 1098 (2011); *see also Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992) (applying Maryland law and stating that "the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract"); *Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 169, 674 A.2d 521, 534 (1996) ("[T]here are different ways to prove that a contractual relationship exists . . . . Traditional bilateral contract theory is one. Detrimental reliance [a.k.a. promissory estoppel] can be another.").

The elements of a claim for promissory estoppel or detrimental reliance in Maryland were established in the touchstone case of *Pavel Enterprises, Inc.*, 342 Md. at 166, 674 A.2d at 532 (emphasis and footnote omitted):

1) a clear and definite promise;
2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
3) which does induce actual and reasonable action or forbearance by the promisee; and
4) causes a detriment which can only be avoided by the enforcement of the promise.

*Accord Citiroof Corp. v. Tech Contracting Co., Inc.*, 159 Md. App. 578, 589, 860 A.2d 425, 432 (2004); *Konover Prop. Trust, Inc. v. WHE Associates, Inc.*, 142 Md. App. 476, 484, 790 A.2d 720, 724 (2002).

### 2. Misrepresentation Claims

Kantsevoy alleges two claims against LumenR that sound in tort rather than in contract, although they largely arise from the same June 12, 2010 Email. Count V is a claim for Deceit, and Count VI is a claim for Negligent Misrepresentation.

As a preliminary matter, claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See,*

*e.g., E-Shops Corp. v. U.S. Bank N.A.,* 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland Consumer Protection Act claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.,* 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe,* 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

Notably, however, Rule 9(b) by its plain text permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that

plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew,* 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Regardless of the particular theory, at trial the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor,* 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

To assert a claim for deceit, which is equivalent to fraud, a plaintiff must allege the following elements:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994) (citations omitted). "Moreover, the false statement must be of a material fact." *Gross v. Sussex Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993) (footnote and citation omitted).

Although deceit and negligent misrepresentation "share common elements," such as the making of a false statement and reliance by the plaintiff, "[t]here is a critical difference between the two torts." *Id.* at 259-60, 630 A.2d at 1162. Fraud must be intentional on the part of the

defendant, and negligent misrepresentation "only requires conduct which falls below the standard of care the maker of the statement owes to the person to whom it is made." *Id.* (citations omitted).

In *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 916 A.2d 257 (2007), the Maryland Court of Appeals set forth the elements of a claim for negligent misrepresentation under Maryland law. It said:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Id.* at 136, 916 A.2d at 273 (citations and internal quotation marks omitted).

Numerous Maryland cases are to the same effect. *See*, *e.g.*, *Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010); *Griesi v. Atlantic Gen'l Hosp. Corp.*, 360 Md. 1, 11, 765 A.2d 548, 553 (2000); *Valentine v. On Target, Inc.*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 336-37, 439 A.2d 534, 539 (1982); *Virginia Dare Stores v. Schuman*, 175 Md. 287, 291-92, 1 A.2d 897, 899 (1938); *see also Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 290-91 (D. Md. 2003).

### C. Kantsevoy's Claims for Monetary Compensation

#### 1. Count I

As noted, "[a] contract is formed when an unrevoked offer made by one person is accepted by another." *Silverman*, 58 Md. App. at 57, 472 A.2d at 112. And, the requisite mutual assent requires "(1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

Piskun's June 12, 2010 Email states, in relevant part, ECF 25-2: "If this is acceptable to you we would compensate your consulting time with $500/hour and $2500/day if need to spend a day on the company's business (meetings, labs, clinical studies, etc.) . . . ." Kantsevoy replied, in relevant part, *id.*: "Yes, I am interested."

These terms are sufficiently definite to form a contract. The offer specifies a price ($500 per hour, or $2,500 per day), to be paid in consideration for "consulting time." There is no suggestion that the parties were unaware of what services were intended. Several examples of the proposed consulting services were provided: meetings, labs, and clinical studies. And, at the pleading stage of this litigation, Kantsevoy's allegation that his response constituted an acceptance of this offer (ECF 1, ¶ 28) must suffice.

Indeed, the LumenR Motion barely challenges the sufficiency of the contract with regard to the monetary compensation; it merely raises the fact that the offer begins with "if," and the acceptance expresses an intention to discuss more details in the future. ECF 25-1 at 9. By this, LumenR seems to imply that the contract was contingent and not final. *Id.* But, these arguments miss the mark with regard to Kantsevoy's fee claims. The "if" is in the context of "if this is acceptable to you," clearly indicating that the only contingency is Kantsevoy's acceptance of the price terms. Furthermore, Kantsevoy's statement, "We can discuss more details by e-mail or by phone," does not defeat the acceptance in this context. Although the parties must agree on the *essential* terms, *see Cochran*, 398 Md. at 14, 919 A.2d at 708, they need not immediately define *all* terms.

Kantsevoy plausibly alleges that there was an offer of payment for services (ECF 1, ¶ 27), that he accepted that offer (*id.* ¶ 28), that he held up his end of the contract (*id.*), and that LumenR failed to properly pay him (*id.* ¶ 29). I am mindful that "when the complaint . . . .

shows that the plaintiff has adopted the contents of [a] document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. The June 12, 2010 Email (ECF 25-2) does not undermine these allegations. Therefore, I conclude that Count I states a claim for breach of express contract with respect to the alleged underpayment of hourly and per diem fees to plaintiff.

### 2. Count II

Count II, for breach of implied-in-fact contract, also states a claim, for slightly different reasons. As discussed, an implied-in-fact contract is "inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688 (citation and internal quotation marks omitted). Kantsevoy has alleged a meeting of the minds as to his hourly and per diem compensation. ECF 1, ¶¶ 33-34. On several occasions, Kantsevoy provided services with the expectation that he would be paid. *Id.* ¶ 36. But, he alleges that he was not paid in accordance with the parties' alleged agreement. *Id.* ¶ 37. Moreover, Kantsevoy has alleged that LumenR should have expected to pay for these services. *Id.* ¶ 34 ("[I]t is axiomatic that businesses pay people for their work").

LumenR asserts that Kantsevoy cannot state a claim for breach of implied-in-fact contract, because "an implied-in-fact contract cannot be created based solely on the words of the parties." ECF 25-1 at 11. But, Kantsevoy has alleged actions, as well: On eight occasions, LumenR *did* pay Kantsevoy for his work, although it did not pay him the full amount indicated in the June 12, 2010 Email. ECF 1, ¶ 37. And, it accepted his work on other occasions. *Id.* ¶ 35.

At this juncture, I must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citation and internal quotation marks omitted). I

conclude that, with respect to the hourly and per diem fees, Kantsevoy has stated a claim for breach of implied-in-fact contract.

### 3. Count IV

LumenR appears to concede in its motion that Piskun's promise of monetary compensation for Kantsevoy's consulting time is sufficient to state a claim for promissory estoppel. ECF 25 at 12-13. I agree that Kantsevoy has stated a claim for promissory estoppel with respect to his consulting fees.

### 4. Count V & Count VI

LumenR moves to dismiss Kantsevoy's claims for deceit and negligent misrepresentation. But, it discusses only the equity portion of the claims. ECF 25 at 14-16.

As discussed, plaintiff's fraud claim implicates the heightened pleading standard under Fed. R. Civ. P. 9(b). *See Iqbal*, 556 U.S. at 686 ("Rule 9(b) requires particularity when pleading 'fraud or mistake,' while allowing '[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally.'")

A "defendant's deliberate misrepresentation of his existing intentions, where the misrepresentation was material to the transaction giving rise to the alleged fraud, may form the basis for an action in fraud or deceit." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 197, 665 A.2d 1038, 1048 (1995) (citations omitted). And, a "speaker's statement of what he or she will do in the future may constitute a representation of the speaker's present intention, which may support an action for negligent misrepresentation." *Gross*, 332 Md. at 272, 630 A.2d at 1169 (citing *Weisman v. Conners*, 312 Md. 428, 454-58, 540 A.2d 783, 796 (1988)).

Kantsevoy has alleged that Piskun promised him hourly and per diem compensation for his consulting (ECF 1, ¶¶ 53, 58), and that "LumenR either knowingly made a false statement to

[Kantsevoy], or the representation [of intent to compensate him] was made with reckless indifference to the truth." *Id.* ¶ 53. Kantsevoy alleges that the conscious or negligent falsity of this statement of present intention caused Kantsevoy damages. *Id.* ¶¶ 56, 61. To be sure, plaintiff has alleged the "who" (Gregory Piskun), "what" (that he would be paid certain fees for doing certain work), "when" (June 12, 2010), and "where" and "how" (via email).

However, "[t]he mere failure to carry out a promise in contract . . . does not support a tort action for fraud." *Strum v. Exxon Co.*, 15 F.3d 327, 331 (4th Cir. 1994) (construing North Carolina law). In my view, Kantsevoy has stated a claim for negligent misrepresentation with respect to LumenR's promise of consulting fees, but not a claim for fraud. Under the heightened pleading standard of Rule 9(b), the claim for fraud falls woefully short.

Plaintiff baldly contends that, at the relevant time, LumenR never intended to pay plaintiff. ECF 1, ¶ 53. But, there are no factual allegations to support that claim. Indeed, plaintiff alleges that he did receive payments from LumenR, although he was not paid in full. ECF 1, ¶ 21. Nor are there any factual allegations of guile, surreptitiousness, or deceit to induce the contract as to the alleged fees. In the context of Fed. R. Civ. P. 9(b), the *Strum* Court said that dismissal was appropriate "[b]ecause [the plaintiff] ha[d] done nothing more than assert that [defendant] never intended to honor its obligations under the . . . agreement." *Strum*, 15 F.3d at 331. The same logic applies here.

I shall next discuss plaintiff's claims stemming from the alleged promise of an "equity ownership package."

### D. Kantsevoy's Claims for Equity

#### 1. Count I

Kantsevoy plainly never entered an express contract with LumenR for an "equity ownership package." As previously discussed, a key element of contract formation is mutual assent, which comprises "(1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

LumenR asserts that Kantsevoy fails to state a claim for breach of express contract as to the purported equity package for two main reasons. First, LumenR focuses on the contingent nature of Piskun's "offer"; *i.e.*, challenging Piskun's intent to be bound. ECF 25-1 at 9. Second, LumenR points to the indefinite nature of the material term (price or amount of equity). *Id.* at 10. Both arguments deserve to be credited.

Again, as noted, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. The language of Piskun's June 12, 2010 Email, undisputed by Kantsevoy, is unquestionably provisional and contingent. Piskun wrote, ECF 25-2, "If it happens that you [sic] really excited about the technology and believe in its future, we can create an equity ownership package which may be a very substantial exit for you." The grammatical shortcomings of the sentence aside, Piskun clearly meant to invite Kantsevoy's collaboration such that partnership in the venture might occur at some future point.

Unlike the offer of consulting fees, the only contingency of which was "[i]f [the fees are] acceptable to you," the discussion of equity depends not just on acceptance but on (a) excitement about the technology, and (b) the *creation* of an equity package. *Id.* Notably, the June 12, 2010

Email begins with Piskun's suggestion: "Let's start by introducing the technology to you?" *Id.* If Kantsevoy had not yet been introduced to the technology, it seems unlikely that he would already have developed the requisite excitement about it.

Similarly, Piskun's suggestion of an equity package is forward-looking. "If it happens" that Kantsevoy is excited about the device, Piskun proposes that the parties "can create" an equity ownership package. *Id.* The equity ownership package has not been created, nor is it clear that Kantsevoy believes in LumenR's future. Notably, Piskun does not ask Kantsevoy to *commit* to excitement about the technology or belief in its future; rather, he indicates that if these feelings arise in the course of Kantsevoy's "involve[ment]" (for which he is to be compensated at an hourly or per diem rate), an equity package "can" be "create[d]."

By analogy, the offer of an Associate position at a law firm, which at some point could result in promotion to Partner, is not a guarantee of partnership. An invitation to go on a date does not commit the parties to marriage, even if marriage may potentially result. Clearly, Kantsevoy and LumenR never tied the knot.

Second, LumenR emphasizes that the parties did not negotiate terms more definite than "an equity ownership package which may give a very substantial exit." ECF 25-1 at 9-10. LumenR contends that even if there were some mutual intent to grant Kantsevoy some amount of equity, the agreement is unenforceably vague, and this Court "cannot make an agreement for the parties." *Id.* at 10 (quoting *Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354, 356 (1950)).

Kantsevoy offers three arguments in response. First, he asserts that the "parties' course of performance fleshes out the details" of the contract. ECF 26 at 11. Second, he maintains that the "parties' course of dealing also fills in details about . . . the amount of equity interest owed under the contract." *Id.* at 13. Third, Kantsevoy insists that, when viewed in context, it is clear

that "both [parties] understood that all subsequent discussions focused on *how much* equity compensation would be reasonable under the circumstances," and not "*whether* an equity interest was owed." *Id.* at 18. Each of these arguments fails.

"Course of performance" and "course of dealing" are technical legal terms, defined in Md. Code (2013 Repl. Vol, 2017 Supp.), § 1-303(a) of the Commercial Law Article ("C.L.").

C.L. § 1-303(a) defines "course of performance" as "a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection."

This term does not apply. A course of performance is established where a "contract for sale involves repeated occasions for performance by either party." *See Maryland Supreme Corp. v. Blake Co.*, 279 Md. 531, 543, 369 A.2d 1017, 1026 (1977); *see also* 28 *Williston on Contracts* § 70:141. Even if Kantsevoy's purported contract is a sales contract, Kantsevoy has not alleged "repeated occasions for performance." The alleged performance was ongoing (*see* ECF 1, ¶ 43), and thus not a course of performance.

Similarly, a "course of dealing" is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." C.L. § 1-303(b). But, Kantsevoy and LumenR had no "previous transactions" that would clarify the terms of the June 12, 2010 Email. Instead, Kantsevoy asserts that his subsequent negotiations with HET (not LumenR) in September 2011 shed light on the intended "equity ownership package." ECF 26 at 14.

There are many problems with Kantsevoy's argument that the terms of his agreement with HET govern his agreement with LumenR. Most obviously, HET is not LumenR, and is not alleged to be, although Piskun appears to have been involved in both companies. *See* ECF 12, ¶ 11. In fact, the Complaint does not even mention HET. Therefore, on the basis of Kantsevoy's pleadings alone, I cannot find that Kantsevoy's agreement with HET informs his alleged agreement with LumenR.

Even if I were to consider Kantsevoy's arguments related to the HET Agreement, it would not help Kantsevoy's cause. Kantsevoy asserts (based on LumenR's pleadings) that in an email accompanying a draft of the HET Agreement, Piskun wrote: "[W]e will create the identical agreement for LumenR when ready to execute." ECF 26 at 14. But, Kantsevoy never alleges that Piskun and Kantsevoy actually *did* "create the identical agreement for LumenR," or that Kantsevoy ever *was* ready to execute.[3]

Kantsevoy argues, in the alternative, that "the mere fact that Dr. Piskun's June 2010 offer lacks a specific price term would not be fatal at this stage of the case." ECF 26 at 14. He cites *Mastercraft Interiors, Ltd. v. ABF Freight Sys., Inc.*, 350 F. Supp. 2d 686, 692 (D. Md. 2004) and *Hanna v. Bauguess*, 49 Md. App. 87, 95, 430 A.2d 104, 108 (1981), for the proposition that, "[g]enerally, a contract is not automatically unenforceable because parties do not explicitly state a definitive numeric price." *Mastercraft*, 350 F. Supp. 2d at 692. Instead, Kanstsevoy asserts, "courts may interpret an offer with no price term as an offer 'for a fair and reasonable price.'" ECF 26 at 14 (quoting *Hanna*, 49 Md. App. at 95, 430 A.2d at 108).

_____

[3] Indeed, if I were to consider this communication from Piskun to Kantsevoy, more than a year after the June 12, 2010 Email, I might conclude that no such agreement had been executed as of that time.

Plaintiff misreads *Hanna*. In that case, the Maryland Court of Special Appeals considered a contract for the sale of land, where the exact sale price was not fixed but rather was set to be the average of the valuations determined by three "independent realty appraisers." *Hanna*, 49 Md. App. at 95-96, 430 A.2d at 108-09. The court made clear that "although price is an essential element in a contract for the conveyance of land, it has been held in this State that specific performance may be granted even though the exact price is not stated, *provided the contract defines a method which renders the price readily ascertainable*." *Id.* at 93, 430 A.2d at 107 (emphasis added). Because the contract defined a method for ascertaining the price (the average value arrived at by the appraisers), the price term was not indefinite.

Putting aside the fact that the alleged contract is not a contract for the conveyance of land, Kantsevoy overlooks this central defect of his Complaint: Not only does the "equity ownership package" lack a defined value, there is no conceivable way for the Court to determine or even estimate its value. Kantsevoy insists that Piskun promised an equity interest, which Kantsevoy admits is "unspecific" (ECF 26 at 15), but he never offers a way to determine the value of that interest beyond asserting that it should be "reasonable." *Id.*

In my view, this defect renders the terms of the contract indefinite in regard to equity interest in LumenR. If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero*, 142 Md. App. at 272, 790 A.2d at 51. Therefore, Kantsevoy fails to state a claim for breach of express contract as to his equity claim.

### 2. Counts II & IV

Kantsevoy's claims of breach of implied-in-fact contract and promissory estoppel fail to state a claim for the same basic reason. A "contract—be it express or implied-in-fact—requires

definite terms." *Dolan*, 215 Md. App. at 36, 79 A.3d at 401. "Similarly, a claim for promissory estoppel requires 'a clear and definite promise.'" *Id.* at 32, 79 A.3d at 399 (quoting *Pavel Enterprises, Inc.*, 342 Md. at 166, 674 A.2d at 532).

Kantsevoy's alleged implied-in-fact contract, and his alleged "promise" from Piskun, like his express contract, fail to define the amount or value of the asserted "equity ownership package." None of the "subsequent actions" to which Kantsevoy alludes fills in this gap. As discussed above, the HET Agreement is not mentioned in Kantsevoy's Complaint, and in any case is never alleged to have been executed by LumenR.

In *Adams v. Kelley*, No. 29, Sept. Term, 2016, 2017 WL 944290 (Md. Ct. Spec. App. Mar. 10, 2017) (unpublished), the Maryland Court of Special Appeals considered a similar circumstance. There, the plaintiff sought a portion of the proceeds resulting from the sale of a business for which she had worked. *Id.* at *4. Among other theories, the plaintiff alleged a claim of promissory estoppel, supported by the defendant's statement that, "'[i]f the company comes to sale during, or after the terms of [the plaintiff's employment] contract, [the plaintiff] will receive her shares of the profit of sale.'" *Id.* at *5 (citation omitted) (first alteration in *Adams*). The defendant argued, *inter alia*, that the plaintiff's "alleged share of the profits of the assets sale was undefined." *Id.* at *6.

The Maryland Court of Special Appeals agreed with the defendant. Because the plaintiff presented no evidence of "as to what that interest would be, . . . the language she offered was not clear or definite enough to establish what ownership interest, if any, she would be entitled to at the time of a sale." *Id.* at *12. Accordingly, "there was no evidence from which a fact-finder could infer a definite set of promises that estops [the defendant]." *Id.* Without an indication of

"how the parties intended for [the plaintiff's] ownership interest to be determined . . . . the alleged agreement was too vague." *Id.*

Likewise, Kantsevoy's reassertions that Piskun "repeatedly assured him that LumenR would adequately compensate Dr. Kantsevoy for his time and efforts" (ECF 1, ¶ 13) are unavailing. The problem is not that Kantsevoy has failed to allege a promise; the problem is that Kantsevoy has failed to allege a *clear and definite* promise. For this reason, he cannot be considered to have entered an enforceable implied-in-fact contract, and cannot invoke the doctrine of promissory estoppel with regard to his equity claims.

Kantsevoy's core argument is that if the June 12, 2010 Email is an "*enforceable* offer to provide compensation in the form of fees of [sic] per diem or hourly fees, on one hand, and an *unenforceable* statement about potential equity interest, on the other hand," then "LumenR could satisfy its debt without compensating Dr. Kantsevoy with any equity interest in the company—and for an amount far less than he was led to believe could result from a successful sale of the Tissue Retractor." ECF 26 at 22. He also states, *id.* at 19 (citation omitted): "Businesses typically cannot expect to get something for nothing. So LumenR's insistence that Dr. Kantsevoy intended to work for free (or at a sharply discounted rate) cuts strongly against 'the ordinary course of dealing and the common understanding of men.'"

Essentially, Kantsevoy argues that it is unfair to deny him an equity interest in LumenR when he was led to expect that he would get one. Fortunately for Kantsevoy, he is not without a remedy: Enforceable contracts and promissory estoppel require agreements with definite terms, but "a claim for unjust enrichment does not." *Dolan*, 215 Md. App. at 36, 79 A.3d at 401. And, LumenR has not moved to dismiss Kantsevoy's claim for breach of implied-in-law contract.

### 3.  Counts V & VI

LumenR argues that Kantsevoy fails to state a claim for deceit and negligent misrepresentation because "there was no actionable 'false representation' made" to satisfy that element of the causes of action.  ECF 25-1 at 14.  LumenR contends that an action for deceit must allege a false statement "of an alleged existing fact or facts, and not merely of some future or contingent event, or an expression of opinion." *Id.* (quoting *Babb v. Bolyard*, 194 Md. 603, 609, 72 A.2d 13, 16 (1950)).  And, according to LumenR, Piskun's June 12, 2010 Email "is clearly not making any representations about an existing fact, and instead is referring to some 'future or contingent event' which may or may not occur." *Id.* at 14-15 (citation omitted).

Kantsevoy responds by citing Maryland law suggesting that false statements of present intention as to future events *can* sustain actions for deceit and negligent misrepresentation when the speaker has control over whether the future events occur.  *Weisman*, 312 Md. at 455, 540 A.2d at 796.  The Maryland Court of Appeals has held that "misrepresentation of one's own intention may constitute the misrepresentation of a present fact." *Id.* at 456, 540 A.2d at 796.  Kantsevoy asserts that the expected event—in his telling, the sale of LumenR to another company—*did* in fact occur, making Piskun's promise of equity no longer contingent.  ECF 26 at 23-24.

Kantsevoy's claims do not address LumenR's argument.  The asserted defect in Kantsevoy's pleading is not the uncertainty of the sale and LumenR's *ability* to give Kantsevoy an equity package.  Rather, LumenR insists that, as is the case for Kantsevoy's contract claims, Piskun never made a promise of equity such that the promise could be broken and the statement of intent rendered false.  ECF 25-1 at 15-16.  In other words, Piskun never definitively said he

would give Kantsevoy equity, so his failure to give the equity does not mean he lied (or negligently misrepresented anything).

This is accurate as far as the June 12, 2010 Email is concerned.  However, both parties largely overlook the rest of Kantsevoy's allegations.  In particular, Kantsevoy also alleged that "during a July 2015 flight to Amsterdam . . . Dr. Piskun confirmed that Dr. Kantsevoy would be provided an equity stake in LumenR."  ECF 1, ¶ 13.  In Count V, Kantsevoy "incorporate[d] by reference the allegations contained in the preceding paragraphs."  *Id.* ¶ 52.  Thus, Kantsevoy has alleged an actual promise of equity, albeit in an undefined amount.

This alleged false statement does not rise to the level of definiteness that could support a claim for promissory estoppel, as it lacks a clear price term.  But, drawing all reasonable inferences in favor of Kantsevoy, I conclude that it meets the heightened pleading requirements of Rule 9(b).  Kantsevoy alleged the approximate time (July 2015), place (airplane to Amsterdam), speaker (Piskun), and content (affirmation of an equity interest upon the sale of LumenR) of the false statement.  ECF 1, ¶ 13.  And, unlike Kantsevoy's deceit claim regarding payment of his fees, plaintiff has actually alleged that Piskun "repeatedly assured him" that he would be paid in equity (*id.*), and later "disavowed his repeated offers of an equity stake."  *Id.* ¶ 23.  These alleged assurances, coupled with Piskun's alleged "refus[al] to provide a straightforward answer" as to the size of the equity package (*id.* ¶ 23), imply that LumenR sought to string Kantsevoy along to gain the benefit of his services, without any intention to provide him with an equity interest in the company.  No comparable facts were pleaded as to the claim concerning the fee agreement.

The allegations in regard to the equity interest can be fairly construed to allege generally "[m]alice, intent, knowledge, [or] other conditions" as to Piskun's state of mind, as contemplated

by Rule 9(b). Therefore, "[t]o the extent that LumenR never intended to follow through" on its promise and its "subsequent verbal reaffirmations of this commitment," Kantsevoy has satisfactorily alleged the elements of a cause of action for deceit. ECF 1, ¶ 53.

Kantsevoy did not specifically incorporate the preceding paragraphs of his Complaint into Count VI, for negligent misrepresentation. However, as LumenR acknowledges, Kantsevoy's "claims for Deceit and Negligent Representation rise and fall together." ECF 28 at 14. Assuming all the allegations as true and making all reasonable inferences in favor of Kantsevoy, I conclude that the Complaint also states a claim for negligent misrepresentation.

## V. Kantsevoy Motion

### A. Overview of LumenR's Claims

LumenR's Answer and Counterclaims assert four counterclaims against Kantsevoy: Breach of Express Contract (First Counterclaim), Breach of Implied-in-Fact Contract (Second Counterclaim), Tortious Interference with Business Relations (Third Counterclaim), and Deceit (Fourth Counterclaim). ECF 12 at 18-22. LumenR also raises a number of affirmative defenses to Kantsevoy's claims. *Id.* at 8-10. The Kantsevoy Motion seeks to dismiss LumenR's Fourth Counterclaim, for deceit, and to strike two of its affirmative defenses, pleaded as "doctrine of estoppel" and "doctrine of unclean hands." ECF 27; ECF 12, ¶¶ 64, 65. Kantsevoy also moves to strike "all allegations regarding Dr. Kantsevoy's financial disclosures to third parties because those allegations are both immaterial and scandalous." *Id.*

The Fourth Counterclaim alleges that "Kantsevoy made multiple representations to LumenR, peer reviewed publications, professional associations and even to regulatory bodies that he had no relevant financial interests or conflicts with LumenR." ECF 12, ¶ 45. However, LumenR maintains that Kantsevoy later asserted an entitlement to retroactive payment and an equity interest in LumenR. *Id.* ¶ 46. LumenR contends that Kantsevoy's latter assertion—that

he *did* have an interest in LumenR—was false, that Kantsevoy knew it was false, and that he intended to extort and defraud LumenR. *Id.* ¶¶ 47, 49. Furthermore, LumenR alleges that it "was justified in relying on Kantsevoy's representations [that he was] free of financial conflicts." *Id.* ¶ 50. According to LumenR, "Kantsevoy's false statements diminished the consideration ultimately paid" by the company that bought the rights to the Tissue Retractor. *Id.* ¶ 51.

In its Third Affirmative Defense, LumenR alleges that Kantsevoy's contract-based claims are "barred by the Doctrine of Estoppel based on Kantsevoy's numerous statements to LumenR, and numerous statements to third parties that Kantsevoy has no financial interest or conflict with respect to LumenR." *Id.* ¶ 64. In its Fourth Affirmative Defense, LumenR asserts that Kantsevoy "is estopped from obtaining any recovery for any of Counts I-VI under the doctrine of unclean hands." *Id.* ¶ 65. Similar to its Third Affirmative Defense, LumenR asserts that Kantsevoy publicly represented that he had no financial interest in LumenR, and therefore cannot be allowed to maintain a contrary position. *Id.*

### B. Motion to Dismiss Deceit Claim

Kantsevoy's argument for the dismissal of LumenR's deceit claim begins with a repetition of the elements of a cause of action for deceit, ECF 27-1 at 12 (quoting *SpinCycle, Inc. v. Kalender*, 186 F. Supp. 2d 585, 590 (D. Md. 2002)):

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

Kantsevoy attacks the fourth and fifth elements of LumenR's claim. He argues that LumenR does meet the fourth element because it never actually relied on the misrepresentation it alleges, *i.e.*, that Kantsevoy was in fact owed "a retroactive payment by LumenR and/or an

equity interest in LumenR." ECF 27-1 at 12-13 (quoting ECF 12, ¶ 46). His point is well taken. To state a claim for deceit, a plaintiff must have justifiably relied on a false representation, to his or her detriment. *Nails*, 334 Md. at 415-17, 639 A.2d at 668-69. But, this entire suit turns on the fact that LumenR did *not* credit Kantsevoy's entitlement to compensation, and that entitlement is the assertion that LumenR alleges to be false. ECF 12, ¶ 47.

In its Opposition, LumenR shifts its position and argues that it was harmed by Kantsevoy's false statement because Kantsevoy's unethical behavior harmed the credibility of his work on LumenR and reduced LumenR's sale value. ECF 29 at 10. This may be an accurate assessment, but it does not state a claim for deceit. To claim deceit, a party must allege that the defendant's misrepresentation, at the very least, "substantially induced" the party to act. *Nails*, 334 Md. at 416-17, 639 A.2d at 669. Here, however, LumenR asserts that it relied "on the belief that Kantsevoy was performing and reporting on his work with the LumenR device in an ethical manner." ECF 29 at 10. That is, it relied on the *absence* of a conflict of interest. And, in its Answer and Counterclaims, LumenR appears to have alleged that there was in fact no conflict. ECF 12, ¶¶ 46-48. I must take this allegation as true. *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440. Thus, LumenR relied on a statement—the absence of a financial interest—which it still maintains is an accurate one. As a result, it cannot sustain a claim for deceit against Kantsevoy.

Kantsevoy also claims that LumenR was not harmed by Kantsevoy's shifting representations, and that for this reason, too, it cannot state a claim for deceit. ECF 27-1 at 13. In particular, Kantsevoy maintains that LumenR "benefited [sic] from Dr. Kantsevoy's statements that he did not have a current financial interest in the company" because "those statements made it easier for Dr. Kantsevoy to publish a paper and make presentations about the

Tissue Retractor than would have been possible otherwise." *Id.* This line of argument impugns Kantsevoy's own character more than it hurts LumenR's position.

In any case, LumenR cannot state a claim for deceit because it does not allege reliance on Kantsevoy's misrepresentation.

## C. Motion to Strike

Kantsevoy moves to strike LumenR's affirmative defenses of estoppel and "unclean hands" (ECF 27-1 at 14-16), as well as all of LumenR's allegations pertaining to Kantsevoy's allegedly inconsistent or unethical financial disclosures. *Id.* at 17-18. As noted, LumenR alleges that Kantsevoy "represented to LumenR, to peer reviewed publications, to professional organizations and . . . to the [Institutional Review Board] of Mercy Hospital, that Kantsevoy had no relevant financial disclosures and no financial conflicts." ECF 12, ¶ 20. Kantsevoy seeks to strike this and related allegations, and the affirmative defenses based on those allegations, as unavailing, immaterial, and scandalous. ECF 27.

Fed. R. Civ. P. 12(f) governs motions to strike. Rule 12(f) provides, in part: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *See, e.g., Haley Paint Co. v. E.I. du Pont de Nemours & Co.*, 279 F.R.D. 331, 335 (D. Md. 2012). In determining whether to grant a motion to strike, the court "enjoys wide discretion . . . in order 'to minimize delay, prejudice and confusion by narrowing the issues for discovery and trial.'" *Id.* at 336 (citation omitted).

"Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (citation and internal quotation marks omitted); *see also Renaissance Greeting Cards, Inc. v. Dollar Tree*

*Stores*, 227 F. App'x 239, 247 (4th Cir. 2007). Therefore, "[w]hen reviewing a motion to strike, 'the court must view the pleading under attack in a light most favorable to the pleader.'" *Piontek v. Serv. Ctrs. Corp.*, PJM-10-1202, 2010 WL 4449419, at *8-9 (D. Md. Nov. 5, 2010) (citation omitted).

Ordinarily, Rule 12(f) motions "will be denied unless the matter under challenge has 'no possible relation to the controversy and may prejudice the other party.'" *U.S. ex rel. Ackley v. Int'l Bus. Machines Corp.*, 110 F. Supp. 2d 395, 406 (D. Md. 2000) (quoting *Steuart Inv. Co. v. Bauer Dredging Constr. Co.*, 323 F. Supp. 907, 909 (D. Md. 1971)); *accord E.E.O.C. v. Spoa, LLC*, CCB-13-1615, 2014 WL 47337, at *3 (D. Md. Jan. 3, 2014). In contrast, "'the disfavored character of Rule 12(f) is relaxed in the context of scandalous allegations,' *i.e.*, those that 'improperly cast a derogatory light on someone.'" *Asher & Simons, P.A. v. j2 Global Canada, Inc.*, 965 F. Supp. 2d 701, 702 (D. Md. 2013) (citation omitted), *partial reconsideration on other grounds*, 977 F. Supp. 2d 544 (D. Md. 2013). But, a motion to strike a defense "should not be granted when the sufficiency of the defense depends upon disputed issues of fact or unclear questions of law." *Nat'l Credit Union Admin. v. First Union Capital Mkts. Corp.*, 189 F.R.D. 158, 163 (D. Md. 1999) (citation and internal quotation marks omitted); *see Federal Ins. Co. v. Edenbaum*, JKS-12-410, 2012 WL 2803739, at *2 (D. Md. July 9, 2012).

Kantsevoy acknowledges that "motions to strike are disfavored." ECF 27-1 at 11. But, he argues, "LumenR's decision to bring Dr. Kantsevoy on board had nothing to do with his statements about not having a financial interest in LumenR." *Id.* at 14. He insists that the allegations relating to his failure to disclose his alleged financial relationship with LumenR "are unquestionably irrelevant to the claims and defenses at issue here." *Id.* at 17. Moreover, Kantsevoy maintains, they "are scandalous because LumenR accuses Dr. Kantsevoy of

professional dishonesty . . . and intimates that he might have committed a crime (lying to federal regulators)." *Id.*

Of import here, Kantsevoy never asserts that these allegations are false, only that they are scandalous. Perhaps they are. But, they are also relevant, both to LumenR's counterclaim for tortious interference with business relations, and to Kantsevoy's own claims for breach of contract and deceit.

Moreover, as LumenR points out (ECF 29 at 13), Fed. R. Civ. P. 12(f) requires that a motion to strike be made "either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Kantsevoy's motion did not comport with this timeline, and Kantsevoy utterly fails to offer any justification for its tardiness. Instead, it avers that district courts may consider and grant motions to strike on their own. ECF 30 at 14. I shall decline to do so.

Kantsevoy's motion to strike is both untimely and meritless. Any prejudice he suffers from LumenR's allegations of impropriety is not undue. *See Certain Underwriters at Lloyd's, London v. R.J. Wilson & Assocs., Ltd.*, CCB-11-1809, 2012 WL 2945489, at \*5 (D. Md. July 17, 2012). Therefore, I shall deny this part of the Kantsevoy Motion.

## VI.    Conclusion

For the reasons stated, I shall deny the Motion to Amend (ECF 120); I shall grant the LumenR Motion (ECF 25) as to Kantsevoy's contract-based claims for an equity interest in LumenR, and Kantsevoy's deceit claim for fees, and deny the remainder; and, I shall grant the Kantsevoy Motion (ECF 27) as to LumenR's counterclaim for deceit, and deny the remainder.

An Order follows.

Date:   March 13, 2018.                               _____/s/_____
                                                      Ellen Lipton Hollander
                                                      United States District Judge