IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SERGEY KANTSEVOY,
*Plaintiff/Counter-Defendant*,

    v.

LUMENR LLC,
*Defendant/Counter-Plaintiff.*

Civil Action No. ELH-17-359

## MEMORANDUM OPINION

Sergey Kantsevoy, M.D., Ph.D., a gastroenterologist, filed suit against LumenR LLC ("LumenR"), a medical device company, for breach of contract and related claims stemming from Kantsevoy's work in product development for LumenR. ECF 1 (Complaint). In response, LumenR asserted counterclaims for breach of contract, tortious interference with business relations, and related claims. ECF 12 (Answer and Counterclaims).[1]

After a lengthy and contentious discovery period, LumenR filed a motion for partial summary judgment as to its counterclaim against Kantsevoy for tortious interference with business relations. ECF 172. LumenR also asserts that Counts I, II, III, IV, and VI of the Complaint are barred in whole or in part by the statute of limitations. *Id.* The motion is supported by a memorandum of law (ECF 172-1 (redacted); ECF 173 (sealed)), and several exhibits (collectively, "LumenR Motion"). Kantsevoy opposes the LumenR Motion and has filed a cross-motion for partial summary judgment. ECF 178. He seeks summary judgment on Count I of the Complaint, for breach of express contract, and on all three of LumenR's remaining counterclaims. *Id.* The

---

[1] Jurisdiction is founded on diversity of citizenship. ECF 1, ¶ 6. *See* 28 U.S.C. § 1332.

motion is supported by a memorandum (ECF 178-1 (redacted); ECF 179 (sealed)), and many exhibits (collectively, "Kantsevoy Motion").

LumenR filed a combined opposition to the Kantsevoy Motion and a reply in support of its own Motion. ECF 185 (redacted); ECF 186 (sealed). Kantsevoy replied. ECF 189 (redacted); ECF 190 (sealed).

No hearing is necessary to resolve these motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny the LumenR Motion. And, I shall grant Kantsevoy's Motion in part and deny it in part.

## I.  Factual and Procedural Background[2]

Kantsevoy met Gregory Piskun, M.D., at a medical conference in May 2010. ECF 178-3 (Kantsevoy Decl.), ¶ 9. Piskun is the founder of two medical device companies, LumenR and HET Systems, LLC ("HET Systems"). *Id.* At the time of the conference, both companies were in the process of developing new products. *Id.* HET Systems was designing a hemorrhoid-treatment device and LumenR was in the early stages of developing the "Tissue Retractor," a device that would aid in surgery to remove cancerous lesions and tumors from the colon, stomach, and esophagus. *Id.* ¶¶ 9, 10. Piskun introduced Kantsevoy to the devices at the conference, and Kantsevoy expressed his interest in joining both of the development teams. *Id.* ¶ 11.

Soon after the conference, Piskun sent an email to Kantsevoy on behalf of LumenR. *Id.* The email, dated June 12, 2010, stated, ECF 172-5:

Sergey—Thank you, It is an honor to get you involved. Let's start by introducing the technology to you?
If this is acceptable to you we would compensate your consulting time with $500/hour and $2500/day if need [sic] to spend a day on the company's business (meetings, labs, clinical studies, etc.) If it happens that you really [sic] excited about

---

[2] The factual background is largely drawn from the Declarations and exhibits attached to the motions.

the technology and believe in its future, we can create an equity ownership package
which may be a very substantial exit for you.
Please let me know your thoughts. If you prefer to talk on the phone please don't
hesitate to call me at [REDACTED].
Best Regards,
Greg

Kantsevoy replied: "Yes, I am interested. We can discuss more details by e-mail or by phone—
both way [sic] are good for me. Sergey." ECF 172-5.

There were no further communications about Kantsevoy's potential work for LumenR in
the months following this exchange. Then, in September 2011, Kantsevoy entered into a
consulting agreement with Piskun's other company, HET Systems, LLC (the "Het Agreement").
ECF 185-1 (Piskun Decl.), ¶ 3. The HET Agreement specified that Kantsevoy would receive $500
for each product evaluation form he submitted and a $2,000 honorarium for any speaking
engagement he attended on behalf of the HET project. ECF 172-7 (Consulting Agreement of
9/1/11 between Kantsevoy and HET Systems), at 2. The HET Agreement also provided equity
compensation to Kantsevoy of 50,000 shares. *Id.*

After consulting on the HET project for several months, Kantsevoy began working on the
Tissue Retractor for LumenR. ECF 178-3, ¶ 12. On February 25, 2012, he conducted his first
animal lab with a prototype of the Tissue Retractor. *Id.* Soon thereafter, Piskun sent an email to
Kantsevoy about his compensation. ECF 185-1, ¶ 4. The email, dated February 28, 2012, stated,
ECF 172-6:

Sergey, $2K check for [L]umen[R] lab is coming to you this week. Is it acceptable?
It is a different company so there be will [sic] "from LumenR" on the check. We
will create an agreement for you similar to HET shortly (Scientific advisor). Ok?

Kantsevoy replied: "Sure Gregory, thank you!" *Id.*

LumenR and Kantsevoy never executed a formal agreement. Over the next few years,
however, Kantsevoy performed a variety of services for LumenR in connection with the Tissue

Retractor. ECF 178-3, ¶¶ 19, 20. He conducted animal labs, led several presentations and training sessions, and published a paper. *Id.* ¶¶ 14–16. Kantsevoy also performed approximately fifty human clinical trials with the Tissue Retractor. *Id.* ¶¶ 14–15. He and Piskun agreed that the clinical trials would be self-sponsored and, thus, that Kantsevoy would not be paid by LumenR for his work on the trials. *Id.* However, LumenR provided devices and other in-kind support for the clinical trials. ECF 185-1, ¶ 5.

Piskun was impressed by Kantsevoy's work for LumenR. He described Kantsevoy's contribution to the Tissue Retractor as "instrumental," "tangible" and "outstanding." ECF 172-8 (email from Piskun, 12/4/12); ECF 179-6 (email from Piskun, 8/9/13). However, LumenR did not pay Kantsevoy for many of the services that he performed in connection with the Tissue Retractor. ECF 178-3, ¶ 18; *see also* ECF 172-9 (Kantsevoy Resp. Interrog.) at 18, 33–55 Specifically, according to Kantsevoy, LumenR did not pay him for over thirty-seven presentations and training sessions at which he "championed" the Tissue Retractor. ECF 178-3, ¶ 18. In addition, LumenR made only twelve payments of $2,000 each for the twenty-one animal experiments that Kantsevoy conducted. *Id.* Although the parties agree that Kantsevoy was not entitled to compensation for the human clinical trials that he performed, they vehemently dispute the terms of compensation for the other services that Kantsevoy provided. *See* ECF 178-3, ¶ 14; ECF 185-1, ¶ 5.

For his part, Kantsevoy maintains that he is entitled to the fees and equity outlined in Piskun's email of June 12, 2010, for his work on the Tissue Retractor. ECF 178-3, ¶ 18. He asserts that Piskun asked him to "defer payment until the Tissue Retractor sold" and, because Kantsevoy trusted Piskun, he "very rarely complained" about LumenR's failure to pay him fees. *Id.* Further,

he claims that on several occasions between 2015 and 2016, Piskun told him that LumenR would provide him a reasonable equity ownership package. ECF 172-9 at 5.

Piskun tells a very different story, however. He asserts that Kantsevoy informed him in 2013 that he no longer wanted to serve as a paid consultant for LumenR because he did not want any financial conflicts. ECF 185-1, ¶ 5. Thus, LumenR "did not provide further compensation for his consulting services" but continued to provide in-kind support. *Id.* Further, Piskun states that Kantsevoy never submitted invoices to LumenR and that LumenR did not engage Kantsevoy to perform many of the services for which he now seeks compensation. *Id.* ¶ 6.

Kantsevoy's consulting relationship with LumenR ended in 2016. In April of that year, Kantsevoy learned that LumenR was in negotiations to sell the Tissue Retractor to Olympus Corporation ("Olympus"). ECF 178-3, ¶ 19. In anticipation of the sale, Kantsevoy demanded compensation for his contribution to the product, including an equity package in LumenR. *Id.* Kantsevoy and LumenR negotiated his claim for compensation for several months but were unable to reach an agreement.

In the summer of 2016, LumenR broke off negotiations with Olympus and began negotiating the sale of the Tissue Retractor with Boston Scientific Corporation ("BSC"). ECF 179-12, Tr. 196:2–197:13. LumenR and BSC signed a letter of intent for the transaction on July 14, 2016. *See* ECF 173-2 ("Memorandum Of Terms For Proposed Transaction"). This "Term Sheet," as the parties call it, summarized the proposed transaction. *Id.*; *see also* ECF 173 at 23; ECF 179 at 10. In relevant part, the Term Sheet provided for BSC's acquisition of various products, or assets, of LumenR, and compensation from BSC in the form of a ██████ payment, upon closing; a total of ██████ in milestone payments, and ongoing royalty payments. ECF

173-2 at 2. The█████████in milestone payments included a█████████Development Milestone payment and a█████████Technology Transfer Milestone. *Id. Id.* at 3.

In the following months, while the negotiations were ongoing between LumenR and BSC, Kantsevoy engaged in a series of communications with Brandon Gunther, a BSC employee. ECF 172-19; ECF 172-4, Tr. 59:5–7, 92:2–4. Gunther discussed these conversations with another BSC employee, Michael Ryan, who led the company's negotiations with LumenR. ECF 172-13, Tr. 9:19–24, 91:10–92:11. Ryan testified that, in these conversations, Kantsevoy represented that he "felt that the LumenR technology had been stolen from him … by LumenR." *Id.* at 92:3–11. Ryan also testified that Kantsevoy had threatened to "burn the data" from his clinical trials and that BSC "considered Dr. Kantsevoy's threats when evaluating the transaction." *Id.* at 114:13–118:5.

On October 5, 2016, Kantsevoy sent an email to Gunther in which he outlined ways that BSC could structure its deal with LumenR to "address [Kantsevoy's] fair compension." ECF 172-19. First, he suggested that BSC "resolve all outstanding issues" with Kansevoy by purchasing LumenR at a reduced price and paying him directly "from money previously allocated for higher priced LumenR." *Id.* Alternatively, Kantsevoy proposed that BSC execute a three-party contract between himself, LumenR, and BSC, in which Kantsevoy's compensation was subtracted from the money previously allocated to LumenR. *Id.*

BSC did not restructure its transaction with LumenR in either of the ways that Kantsevoy suggested. However, it did modify the structure of the milestone payments outlined in the Term Sheet in its final agreement with LumenR, the Asset Purchase Agreement. *See* ECF 173-4 (Asset Purchase Agreement). Specifically, the Technology Transfer Milestone was reduced from █████████ to █████████ and a Clinical Report Milestone with an associated payment of █████████ was added. *See id.* The Clinical Report Milestone requires LumenR to provide BSC with the

-6-

reports from Kantsevoy's clinical trials. ECF 173-4 at 81–82; ECF 172-13, Tr. 137:1–138:2. Because Kantsevoy did not give these reports to LumenR, this milestone payment can only be received through his cooperation. ECF 173-1 at 1. In an email to other BSC employees, Ryan stated that this deal was structured so that "LumenR's incentives are aligned to share value equitably with Kantsevoy." *Id.*

The transaction between BSC and LumenR closed on November 1, 2016. *See* ECF 173-4 at 1. To date, LumenR has not satisfied the Clinical Report Milestone and Kantsevoy has not received compensation from LumenR for many of the services that he claims he performed in connection with the Tissue Retractor. ECF 178-3, ¶ 18; ECF 185-1, ¶ 9.

This suit was filed on February 7, 2017. ECF 1. Soon thereafter, the parties moved for judgment on the pleadings. ECF 25; ECF 27. LumenR filed its motion first, seeking to dismiss all of Kantsevoy's claims except for Count III, for breach of a contract implied-in-law. ECF 25. Kantsevoy opposed the motion. ECF 27. Kantsevoy also moved to dismiss LumenR's counterclaim for deceit; strike LumenR's affirmative defenses of deceit and promissory estoppel; and strike from LumenR's pleadings "all allegations regarding Dr. Kantsevoy's financial disclosures to third parties." *Id.*

In a Memorandum Opinion (ECF 169) and Order (ECF 170) of March 13, 2018, the Court dismissed Kantsevoy's claims for equity compensation in Counts I, II, and IV and dismissed his claim for fee compensation as to Count V. *Id.* In addition, the Court dismissed LumenR's counterclaim for deceit. *Id.*

Five counts of the Complaint remain: breach of express contract for fee compensation (Count I); breach of implied-in-fact contract for fee compensation (Count II); breach of implied-in-law contract for fee and equity compensation (Count III); promissory estoppel for fee

compensation (Count IV); deceit for equity compensation (Count V); and negligent misrepresentation for fee and equity compensation (Count VI). ECF 1; ECF 170. In turn, three of LumenR's counterclaims remain: breach of express contract (First Counterclaim); breach of implied-in-fact contract (Second Counterclaim); and tortious interference with business relations (Third Counterclaim). ECF 12 at 18–22; ECF 170. LumenR's affirmative defenses also remain. *See* ECF 12 at 8–12.

LumenR now moves for summary judgment on three separate issues. ECF 172. First, it asserts that the statute of limitations bars Kantsevoy from seeking monetary compensation in regard to Counts I, II, III, and IV for services rendered prior to February 7, 2014. *Id.* In addition, it argues that Kantsevoy's claim for negligent misrepresentation in Count VI is barred by the statute of limitations. *Id.* Finally, LumenR seeks judgment in its favor on its Third Counterclaim, for tortious interference with business relations. *Id.*

Kantsevoy opposes LumenR's Motion and moves for summary judgment on Count I of his Complaint, for breach of express contract. ECF 178. Additionally, Kantsevoy moves for summary judgment on LumenR's First Counterclaim (breach of express contract); Second Counterclaim (breach of implied-in-fact contract); and Third Counterclaim (tortious interference with business relations). *Id.* LumenR does not oppose Kantsevoy's Motion as to its First Counterclaim, but it opposes the remainder. *See* ECF 179 at 26.

Additional facts are included in the Discussion.

## II. Legal Standards

### A. Summary Judgment

Both parties have moved for summary judgment under Fed. R. Civ. P. 56. Under Rule 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most

favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied,* 540 U.S. 822 (2003) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Simply because both sides have moved for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no

genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

## B. Choice of Law

Jurisdiction is founded on diversity of citizenship. ECF 1, ¶ 6. Both parties assume, without discussion, that Maryland law applies. *See* ECF 173 at 12–15; ECF 179 at 16. "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011). *See also Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011). Maryland is, of course, the forum state.

As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Property Trust, Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

Kantsevoy alleges that he entered into the contract underlying his claims while in Maryland. ECF 1, ¶ 8; *see also* ECF 178-3. Although LumenR disputes the allegation that this

contract was ever formed, it does not dispute the application of Maryland law. *See* ECF 12 at 1–2. Similarly, LumenR alleges that it executed the contract underlying its counterclaims while Kantsevoy performed work for the company in Maryland. *Id.* at 12. Kantsevoy disputes this allegation but does not dispute the application of Maryland law. *See* ECF 19, ¶¶ 18–19. Therefore, I shall apply Maryland law.

Regarding tort claims, Maryland applies the law of the state where the alleged harm occurred ("lex loci delicti"). *See, e.g., Proctor v. Washington Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010); *Heffernan*, 399 Md. at 625, 925 A.2d at 651; *Phillip Morris, Inc. v. Angeletti*, 358 Md. 689, 744, 752 A.2d 200, 230 (2000). Because the alleged events took place in Maryland, the substantive tort law of Maryland governs the parties' tort claims. *See Hauch v. Connor*, 295 Md. 120, 123–24, 453 A.2d 1207, 1209 (1983).

Nevertheless, the Fourth Circuit applies the federal rules of procedure to determine "whether there is sufficient evidence to create a jury issue of those essential substantive elements of the action, as defined by state law[.]" *Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir. 1982); *accord Jordan v. Iverson Mall Ltd. P'ship*, No. GJH-14-37, 2018 WL 2391999, at *5 (D. Md. May 25, 2018); *Young v. United States*, 667 F. Supp. 2d 554, 561 (D. Md. 2009).

### C. Principles of Contract Construction

The parties' disputes center on various contract-based claims. Accordingly, it is helpful to review the principles of contract formation and contract interpretation under Maryland law.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2–3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896

A.2d 408, 421–22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g., Joseph Saveri Law Firm, Inc. v. Michael E. Criden, P.A.*, ___ Fed. App'x ___, 2019 WL 181453, at *2 (4th Cir. Jan. 14, 2019) (per curiam) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015). *See also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cty. v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747

A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders, Inc.*, 178 Md. App. at 377–78, 941 A.2d at 1209–10; *see Canaras v. Lift Truck Serv.*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). This includes the determination of whether a contract is ambiguous. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intentions, courts look first to the written language of the contract. *Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step,

determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Baltimore St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at \*5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

As indicated, to determine the parties' intentions, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632–33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v.*

*East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras*, 272 Md. at 350, 322 A.2d at 873); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda,* 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318–19, 888 A.2d 377, 396 (2005).

## III. Discussion

### A. Kantsevoy's Claims

LumenR argues that Counts I, II, III, and IV of the Complaint are partially barred by the applicable statute of limitations and that Count VI is entirely barred. ECF 172. These counts allege breach of express contract (Count I), breach of implied-in-fact contract (Count II), breach of implied-in-law contract (Count III), promissory estoppel (Count IV), and negligent misrepresentation (Count VI). *See* ECF 1. Kantsevoy opposes the LumenR Motion and moves for summary judgment on Count I of his Complaint, for breach of express contract. ECF 178.

Before turning to the parties' specific arguments, it is helpful to elucidate Kantsevoy's claims.

### 1. Elements of Kantsevoy's Claims

The Maryland Court of Appeals has amply explained the distinctions between an "express contract," a "contract implied-in-fact," and a "contract implied-in-law," as well as the elements of a claim for "promissory estoppel."

"An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing." *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688 (quoting *Dashiell*, 358 Md. at 94, 747 A.2d at 606) (emphasis omitted).

Kantsevoy's other contract claims are at least loosely based in the doctrine of quantum meruit, although neither party uses that term. "The Latin term *quantum meruit* means 'as much as deserved.'" *Mogavero*, 142 Md. App. at 274, 790 A.2d at 51 (quoting *Black's Law Dictionary* 1243 (6th ed. 1990)); *see also Blanton v. Friedberg*, 819 F.2d 489, 492 (4th Cir. 1987) ("'The impact of quantum meruit is to allow a promisee to recover the value of services he gave to the

-17-

defendant irrespective of whether he would have lost money on the contract and been unable to

recover in a suit on the contract.'") (citation omitted); *Swedish Civil Aviation Admin. v. Project*

*Mgmt. Enter., Inc.*, 190 F. Supp. 2d 785, 793 (D. Md. 2002) (stating that "'*quantum meruit* is a

method of obtaining a reasonable value for services'") (quoting *First Union Nat'l Bank v. Meyer,*

*Faller, Weisman, & Rosenberg, P.C.*, 125 Md. App. 1, 23, 723 A.2d 899 (1999)).

The Fourth Circuit explained in *Blanton*, 819 F.2d at 492 (quoting *W.F. Magann Corp. v.*

*Diamond Mfg. Co.*, 775 F.2d 1202, 1208 (4th Cir. 1985)):

> "One who has rendered a service or supplied work, labor and materials
> under a contract with another, but who has been wrongfully discharged or otherwise
> prevented from so fully performing as to earn the agreed compensation, may regard
> the contract as terminated and get judgment for the reasonable value of all that the
> defendant has received in performance of the contract . . . .
>
> The underlying purpose of allowing *quantum meruit* recovery is two-fold,
> i.e. to prevent the breaching party from being unjustly enriched and to restore the
> aggrieved party in the contract to the position he occupied prior to entry into the
> contract. *Quantum meruit* merely seeks to return to the plaintiff the reasonable
> value of the services and goods provided to the defendant."

Under Maryland law, a claim for quantum meruit may be based on a contract implied in

fact or a contract implied by law, which is often referred to as unjust enrichment. The Fourth

Circuit explained in *Sanders v. Mueller*, 133 F. App'x 37, 42 n.3 (4th Cir. 2005): "Maryland law

distinguishes between two types of quantum meruit claims, one based on an implied-in-fact

contract (usually designated as quantum meruit) and the other based on an implied-in-law contract

(usually designated as unjust enrichment)." *See also Mogavero*, 142 Md. App. at 275, 790 A.2d

at 52. These terms have "distinct meanings." *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6;

*see Mohiuddin v. Doctors Billing & Mgmt. Solutions, Inc.,* 196 Md. App. 439, 447, 9 A.3d 859,

864 (2010); *Alternatives Unlimited, Inc. v. New Balt. City Bd. of School Comm'rs*, 155 Md. App.

415, 482–87, 843 A.2d 252, 291 (2004).

A contract implied-in-fact, or an "implied contract," is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of [people]." *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688. Maryland courts have said that an implied-in-fact contract arises when "specific services are requested by the defendant." *Mogavero*, 142 Md. App. at 281, 790 A.2d at 55. An implied-in-fact contract "is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'" *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted). As noted, "'The services must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and that the recipient expected, or should have expected, to pay for them.'" *Mogavero*, 142 Md. App. at 277, 142 A.2d at 53 (citation omitted). "Recovery on a contract implied in fact . . . is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services." *Id.* at 276, 790 A.2d at 53.

An implied-in-fact contract "'*refers to that class of obligations which arises from mutual agreement and intent to promise*, when the agreement and promise have *simply not been expressed in words.* Despite the fact that no words of promise or agreement have been used, *such transactions are nevertheless true contracts*, and may properly be called inferred contracts or contracts implied in fact.'" *Mohiuddin*, 196 Md. App. at 448, 9 A.3d at 865 (quoting 1 Richard A. Lord, *Williston on Contracts*, § 1.5, pp. 20–21 (1990)) (emphasis in *Mohiuddin*). *See also Dashiell*, 358 Md. at 94, 747 A.2d at 606 ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary

course of dealing and the common understanding of men.") (internal quotation and citations omitted); *Mogavero*, 142 Md. App. at 275, 790 A.2d at 52 ("An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'"); *Slick v. Reinecker*, 154 Md. App. 312, 318, 839 A.2d 784, 787 (2003) ("'The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'") (quoting *Mass Transit Admin. v. Granite Construction Co.*, 57 Md. App. 766, 774, 471 A.2d 1121 (1984)) (emphasis omitted) (bracketed comments added in *Slick*).

In contrast to express and implied-in-fact contracts, a contract implied-in-law, also known as a "quasi-contract" or unjust enrichment, is a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Maryland Cas. Co.*, 442 Md. at 707, 114 A.2d at 689 (emphasis and citations omitted); *see Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (quoting Restatement (Second) of Contracts, § 4 (1981)); *accord Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 ("A contract implied by law is now what commonly is called quasi-contract . . . ."). However, "'unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. *They are obligations created by law for reasons of justice.*'" *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (citation omitted) (emphasis in *Mohiuddin*). And, "[t]he measure of damages in an unjust enrichment claim is the value of the goods or services rendered by the plaintiff in the hands of the defendant." *Maryland Cas. Co.*, 442 Md. at 709, 114 A.3d at 690 (citing *Mogavero*, 142 Md. App. at 276, 790 A.2d at 53).

Thus, in Maryland, a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties." *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) (internal quotation marks omitted); *Dashiell*, 358 Md. at 101, 747 A.2d at 610 ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists."); *see also FLF, Inc., v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

In *Dolan v. McQuaide*, 215 Md. App. 24, 37, 79 A.3d 394, 402 (2013), the Maryland Court of Special Appeals said (emphasis in original): "This taxonomy can be summed up, as follows: 1) an express contract arises from *verbal* [or written] communication of *definite terms;* 2) a contract implied-in-fact arises from *actions* implying *definite terms;* and 3) unjust enrichment arises from *actions* that do *not* imply *definite terms.*"

Promissory estoppel "is an alternative means of obtaining contractual relief." *Md. Transp. Auth. Police Lodge #34 of the Fraternal Order of Police, Inc. v. Md. Transp. Auth.,* 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010), *rev'd on other grounds*, 420 Md. 141, 21 A.3d 1098 (2011); *see also Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 169, 674 A.2d 521, 534 (1996) ("[T]here are different ways to prove that a contractual relationship exists . . . . Traditional bilateral contract theory is one. Detrimental reliance [a.k.a. promissory estoppel] can be another."); *Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992) (applying Maryland law and stating that "the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract").

In Maryland, the elements of a claim for promissory estoppel, or detrimental reliance, were

established in the touchstone case of *Pavel Enterprises, Inc.*, 342 Md. at 166, 674 A.2d at 532

(emphasis and footnote omitted):

1) a clear and definite promise;
2) where the promisor has a reasonable expectation that the offer will induce
   action or forbearance on the part of the promisee;
3) which does induce actual and reasonable action or forbearance by the promisee;
   and
4) causes a detriment which can only be avoided by the enforcement of the
   promise.

*Accord Citiroof Corp. v. Tech Contracting Co.*, 159 Md. App. 578, 589, 860 A.2d 425, 432 (2004);

*Konover Prop. Trust, Inc. v. WHE Assocs.*, 142 Md. App. 476, 484, 790 A.2d 720, 724 (2002).

Kantsevoy alleges two claims against LumenR that sound in tort rather than in contract.

Count V is a claim for Deceit, and Count VI is a claim for Negligent Misrepresentation. There is

no motion as to Count V. LumenR moves for summary judgment on Count VI.

In *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 136, 916 A.2d 257, 273 (2007) (quotation

marks omitted), the Maryland Court of Appeals set forth the elements of a claim for negligent

misrepresentation under Maryland law:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false
statement; (2) the defendant intends that his statement will be acted upon by the
plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on
the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff,
justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers
damage proximately caused by the defendant's negligence.

Numerous Maryland cases are to the same effect. *See, e.g., Griesi v. Atl. Gen'l Hosp.*

*Corp.*, 360 Md. 1, 11, 765 A.2d 548, 553 (2000); *Blondell*, 413 Md. at 119, 991 A.2d at 94;

*Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *BG & E v. Lane*, 338 Md.

34, 43, 656 A.2d 307, 311 (1995); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 336–37, 439

A.2d 534, 539 (1982); *Va. Dare Stores v. Schuman*, 175 Md. 287, 291–92, 1 A.2d 897, 899 (1938);

*see also Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 290–91 (D. Md. 2003).

## 2. Statute of Limitations

As noted, LumenR argues that Kantsevoy's contract-based claims are partially barred by the applicable statute of limitations and that his claim for negligent misrepresentation is entirely barred. ECF 172.

Because this case comes to this Court on the basis of diversity jurisdiction, I must apply the substantive law of the forum state, including its statute of limitations. *See Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1299 (4th Cir. 1983); *see also Coe v. Thermasol, Inc.*, 785 F.2d 511, 514 n.5 (4th Cir. 1986) (noting that "federal courts sitting in diversity apply the forum state's statute of limitations"). Therefore, I shall apply Maryland law.

Under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. Courts and Judicial Proceedings Article ("C.J.") § 5-101. Actions for breach of contract and negligent misrepresentation are generally governed by Maryland's three-year statute of limitations. *See Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 169, 857 A.2d 1095, 1105 (2004); *Catholic Univ. of Am. v. Bragunier Masonry Contractors, Inc.*, 139 Md. App. 277, 297, 775 A.2d 458, 469 (2001), *aff'd*, 368 Md. 608, 796 A.2d 744 (2002). In addition, "[i]f the remedy sought in equity is analogous to a remedy cognizable at law, and the statute of limitations prescribes a time within which the legal action must be instituted, equity will follow the law and bar the action." *Dual Inc.*, 383 Md. at 160 n.2, 857 A.2d at 1099 n.2 (citation omitted).

"Limitations statutes . . . are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of

time, and (3) serve society by promoting judicial economy." *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 85, 904 A.2d 511, 526 (2006); *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983). "As a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit." *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991).

In Maryland, an action typically accrues at the time of the wrong, unless a judicial or legislative exception provides otherwise. *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131, 31 A.3d 212, 236 (2011) (citation omitted). A cause of action for breach of contract "generally accrues when the contract is breached." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 465 (4th Cir. 2007) (en banc) (citation omitted). Ordinarily, "'the question of accrual in § [C.J.] 5-101 is left to judicial determination,' unless the determination rests on the resolution of disputed facts regarding discovery of the wrong." *Poole*, 423 Md. at 131, 31 A.3d at 236; *see Bank of New York v. Sheff*, 382 Md. 235, 244, 854 A.2d 1269, 1275 (2004) (stating that summary judgment may be appropriate if there is no dispute of material fact as to whether plaintiff was on inquiry notice more than three years before suit was file); *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000) (stating that the determination of accrual "may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied").

Nevertheless, "[r]ecognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," Maryland has adopted the so-called discovery rule to determine the date of accrual. *See Sheff*, 382 Md. at 244, 854 A.2d at 1275; *Frederick Road Ltd. P'ship*, 360 Md. at 95, 756 A.2d at 973. "The discovery rule acts to balance principles of fairness and judicial economy in those

situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc.*, 383 Md. at 167, 857 A.2d at 1104.

Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 444, 749 A.2d 796, 801 (2000)), *aff'd*, 495 F. App'x 350 (4th Cir. 2012); *see Benjamin*, 394 Md. at 75, 904 A.2d at 521. Notably, "[t]his standard ... does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Dual Inc.*, 383 Md. at 167–68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano,* 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *Doe v. Archdiocese of Washington,* 114 Md. App. 169, 188–89, 689 A.2d 634, 644 (1997)).

A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and ... a diligent investigation would have revealed that the plaintiffs were victims of ... the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1104 (quoting *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448–49, 550 A.2d 1155, 1159 (1988)) (alterations in original). Inquiry notice must be actual notice, either express or implied. *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981). But, "[c]onstructive notice or knowledge will not suffice for inquiry notice." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see Poffenberger*, 290 Md. at 637, 431 A.2d at 681.

Application of the discovery rule involves a two-prong test. The Maryland Court of Appeals has explained that the first prong, "sufficiency of the actual knowledge to put the claimant on inquiry notice," concerns "the nature and extent of actual knowledge necessary to cause an ordinarily diligent plaintiff to make an inquiry or investigation that an injury has been sustained."

*Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see O'Hara v. Kovens*, 305 Md. 280, 302, 503 A.2d 1313, 1324 (1986); *Pennwalt*, 314 Md. at 453, 550 A.2d at 1165–66 (noting that a plaintiff must have notice of the nature and cause of his or her injury). As indicated, with regard to inquiry notice, "a person must have actual notice, either express or implied. Express knowledge is direct, whether written or oral, from sources 'cognizant of the fact[s].'" *Benjamin*, 394 Md. at 89, 904 A.2d at 529 (quoting *Poffenberger*, 290 Md. at 636–37, 431 A.2d at 681) (citation omitted). Implied notice occurs "when a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further." *Pennwalt*, 314 Md. at 447, 550 A.2d at 1163.

The second prong, "the sufficiency of the knowledge that would have resulted from a reasonable investigation," requires that after a reasonable investigation of facts, a reasonably diligent inquiry would have disclosed whether there is a causal connection between the injury and the wrongdoing. *Benjamin*, 94 Md. at 90, 904 A.2d at 529; *see Pennwalt*, 314 Md. at 452, 550 A.2d at 1165; *Baysinger v. Schmid*, 307 Md. 361, 367–68, 514 A.2d 1, 4 (1986). "The requirement for inquiry notice is that if a person investigates diligently, the causal connection would be revealed." *Benjamin*, 94 Md. at 90, 904 A.2d at 529.

### a.    Counts I, II, III, and IV

Kantsevoy's contract and quasi-contract claims in Counts I, II, III, and IV are based on LumenR's failure to compensate him in accordance with Piskun's email of June 12, 2010. *See* ECF 1, ¶¶ 26–51. In relevant part, these claims seek compensation for the services that Kantsevoy performed, between February 2012 and April 2016, in connection with the Tissue Retractor. *Id.*; *see also* 172-9 at 18, 33–55

-26-

LumenR argues that, under Maryland's three-year statute of limitations, Kantsevoy's contract and quasi-contract claims are barred in regard to his effort to recover for compensation for services rendered prior to February 7, 2014. ECF 173 at 15.

Kantsevoy filed this suit on February 7, 2017. ECF 1. He does not dispute that some of the services for which he seeks monetary compensation in Counts I, II, III, and IV were rendered outside of the limitations period, or prior to February 7, 2014. *See* ECF 179 at 26–28. However, he argues that his claims for compensation for these services are not time-barred because LumenR's managing agent, Erdo Okatan, "recognized the company's debt within the statutory period." ECF 179 at 27.

The parties assume that Kantsevoy's claims for compensation are time-barred as to services rendered before February 7, 2014, unless LumenR acknowledged its debt to him within the statutory period. Accordingly, they dedicate most of their arguments to disputing the sufficiency of LumenR's acknowledgement. But, even if LumenR did *not* reset the statute of limitations by acknowledging its debt to Kantsevoy, LumenR is not entitled to partial summary judgment on Counts I, II, III, and IV.

LumenR relies on *Singer Co. v. Balt. Gas & Elec. Co.,* 79 Md. App. 461, 558 A.2d 419 (1989), to support its argument that Kantsevoy cannot recover compensation for services rendered outside of the limitations period. In *Singer*, the plaintiff sued BG&E for damages sustained as a result of numerous power interruptions over the course of three years. *Id.* at 467, 558 A.2d at 422–23. The trial court ruled that the plaintiff's action for breach of contract accrued after one of the initial power outages, and that the plaintiff's claim was barred by the statute of limitations because it was filed more than three years after the initial outage. *Id.* at 472, 558 A.2d at 424. The Maryland Court of Special Appeals disagreed, concluding that BG&E had a continuing obligation

to provide plaintiff with electricity and that each power outage was a separate and distinct breach of the power supply contract that "[began] the running of the statute of limitations anew." *Id.* at 474–75, 558 A.2d at 425–26. Therefore, the court determined that the plaintiff could pursue recovery for those alleged breaches and resulting damages that occurred within three years of the filing of the suit. *Id.* at 475, 558 A.2d at 425–26.

Unlike in *Singer*, however, it is not clear from the record when Kantsevoy's claims for monetary compensation accrued and, hence, whether any of his claims are time-barred. Although LumenR argues that Kantsevoy's claims for compensation accrued at the time of service, the record demonstrates that Kantsevoy did not expect payment at the time of service. Indeed, in his Declaration, Kantsevoy stated that Piskun asked him to "defer payment until the Tissue Retractor sold," which did not occur until November 1, 2016. ECF 178-3, ¶ 19. Accordingly, Kantsevoy may not have had inquiry notice of LumenR's failure to compensate him for his services – including those rendered prior to February 7, 2014 – until that time. *See Brown*, 731 F. Supp. 2d at 449 ("Under the discovery rule in Maryland, a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong.") (citations omitted).

On this record, the Court cannot conclude, as a matter of law, that Kantsevoy's claims for monetary compensation for services rendered prior to February 7, 2014, accrued by that date and, hence, are time-barred. *Cf. Sheff*, 382 Md. at 244, 854 A.2d at 1275 (stating that summary judgment may be appropriate if there is no dispute of material fact as to whether plaintiff was on inquiry notice more than three years before suit was file). Therefore, the Court need not determine at this stage whether LumenR reset the statute of limitations by acknowledging its debt to Kantsevoy.

Accordingly, the Court denies the LumenR Motion as to Counts I, II, III and IV of the Complaint.

### b.    Count VI

Count VI of the Complaint alleges negligent misrepresentation. Specifically, Kantsevoy alleges that, "[i]n a June 12, 2010 email from its chief executive officer, LumenR negligently promised to compensate him for his consulting services in the form of both fees and an equity interest in the company." ECF 1, ¶ 58.

LumenR argues that Count VI is time-barred because it is based solely on the statements made by Piskun in his email of June 12, 2010 and, according to LumenR, any claim for negligent misrepresentation arising from that email accrued well before February 7, 2014, *i.e.*, more than three years before suit was filed on February 7, 2017. ECF 173 at 17–18; *see also* ECF 1. As noted, Kantsevoy's claim for negligent misrepresentation is also governed by Maryland's three-year statute of limitations. *See Dual Inc.,* 383 Md. at 169, 857 A.2d at 1105.

Kantsevoy disputes LumenR's characterization of his claim for negligent misrepresentation. He asserts that his claim is not based solely on Piskun's email of June 12, 2010, but is also based on the "false representations" that he identified "[i]n his interrogatory responses and deposition testimony." ECF 179 at 29. Because several of these other statements were made within the three-year limitations period, he argues, his claim for negligent misrepresentation is not time-barred. *Id.*

Kantsevoy's argument is an improper attempt to replead his claim. As alleged in the Complaint, Kantsevoy's claim for negligent misrepresentation is based only on the statements made by Piskun in his email of June 12, 2010. *See* ECF 1, ¶¶ 58–62. Although Kantsevoy references other communications with Piskun in preceding sections of his Complaint, he did not

incorporate by reference those paragraphs into Count VI, for negligent misrepresentation. *See id.* Moreover, Kantsevoy never moved to amend his Complaint, and the time for amending the pleadings has long since passed. *See* ECF 23. *See, e.g., Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (stating that "a plaintiff may not raise new claims after discovery has begun without amending his complaint"); *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013) (holding that the district court properly refused to consider an argument raised by the plaintiff for the first time in her response to the defendant's motion for summary judgment); *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) (holding that the plaintiff could not raise a new claim in response to the defendant's summary judgment motion); *Lee v. Certainteed Corp.*, 123 F. Supp. 3d 780, 794 (E.D.N.C. 2015) (stating that "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion"). Accordingly, the Court agrees that Kantsevoy's claim for negligent misrepresentation is indeed based solely on the statements made by Piskun in his email of June 12, 2010.

That the alleged negligent misrepresentation occurred in 2010, however, is not dispositive. The question is whether Kantsevoy's claim for negligent misrepresentation *accrued* more than three years before February 7, 2017, *i.e.*, before February 7, 2014, and is thus barred by limitations. Again, the record makes clear that the Court cannot make this determination as a matter of law.

There is evidence in the record from which a reasonable trier of fact could find that Kantsevoy did not have actual notice, either express or implied, of LumenR's decision not to compensate him, as outlined in the June 12, 2010 email, until well after February 7, 2014. *See Benjamin*, 394 Md. at 75–76, 904 A.2d at 520–21 (stating that, under Maryland's discovery rule, a cause of action accrues when the plaintiff is on "inquiry notice," meaning the plaintiff in fact knows or reasonably should know of the wrong). For instance, Kantsevoy states in his Declaration

-30-

that Piskun asked him to defer payment until the sale of the Tissue Retractor, which did not occur until 2016. ECF 178-3, ¶ 18. In addition, in his answers to interrogatories, Kantsevoy asserts that in 2015 and 2016, Piskun confirmed, on several occasions, that LumenR would provide him with an equity ownership package. *See* ECF 172-9 at 13.

On this record, the determination of the accrual date is appropriately left to the trier of fact. Accordingly, the Court denies the LumenR Motion as to Count VI.

### 3. Counts I, II

Kantsevoy moves for summary judgment on Count I of his Complaint, for breach of express contract. ECF 178. As noted, "[a] contract is formed when an unrevoked offer made by one person is accepted by another." *Silverman*, 58 Md. App. at 57, 472 A.2d at 112. The requisite mutual assent requires "(1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

According to Kantsevoy, the parties formed an express contract on June 12, 2010. *See* ECF 1, ¶¶ 26–31; ECF 179 at 13–16. Specifically, he claims that Piskun's email of June 12, 2010, constituted a written offer from LumenR. ECF 1, ¶ 27; ECF 179 at 14. In relevant part, Piskun's June 12, 2010 email stated, ECF 172-5: "Let's start by introducing the technology to you? If this is acceptable to you we would compensate your consulting time with $500/hour and $2500/day if need [sic] to spend a day on the company's business (meetings, labs, clinical studies, etc.) . . . ." Kantsevoy further asserts that his reply email constituted an "acceptance." ECF 1, ¶ 28; ECF 179 at 14. In his reply email, Kantsevoy stated, in pertinent part, ECF 172-5: "Yes, I am interested. We can discuss more details by e-mail or by phone – both way[s] are good for me."

Kantsevoy now asks the Court to find that the parties had an express contract, and that LumenR breached this express contract by failing to compensate him $500/hour and $2,500/day for his consulting services in the years following this exchange.

In its opposition, LumenR argues that the terms of Piskun's June 12, 2010 email are not enforceable because they "were materially changed on several occasions by the parties." ECF 186 at 16. Specifically, it asserts that in February 2012 the parties agreed that Kantsevoy's *per diem* rate of compensation would be $2,000, instead of $2,500. *Id.* In addition, LumenR claims that the parties agreed that Kantsevoy would no longer receive compensation for his services in 2013, after he began conducting his clinical trials. *Id.*

Before determining whether the parties modified their contract, however, the Court must first determine whether the parties in fact created an enforceable contract. And, the only evidence submitted by Kantsevoy in support of his assertion that the parties created an express contract is the email exchange between the parties on June 12, 2010. *See* ECF 179 at 14.

In my view, the language of the parties' June 12, 2010 email exchange does not constitute the creation of a binding contract. *See Walton,* 391 Md. at 660, 894 A.2d at 594 (stating that a court construing an agreement "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated").

Piskun's email of June 12, 2010 was obviously incomplete as to material terms. It did not specify the nature and extent of the consulting work that Kantsevoy was to provide; it merely listed examples of the type of work that Kantsevoy *might* perform – *i.e.*, "meetings, labs, clinical trials, etc." ECF 172-5. Nor did it identify the date his work was to begin or where it was to occur. Further, the email did not contain any terms as to the timing and method of payment from LumenR.

Without these terms, it is impossible to determine what the nature and extent of the parties' obligations, if any. *See, e.g., Kiley v. First Nat'l Bank of Md.,* 102 Md. App. 317, 333, 649 A.2d 1145, 1152 (1994) (stating that "an enforceable contract must express with definiteness and certainty the nature and extent of the parties' obligations"), *cert. denied*, 338 Md. 116, 656 A.2d 772 (1995), *cert. denied*, 516 U.S. 866 (1995). Maryland courts have refused to enforce agreements that are so vague and indefinite. *See, e.g., Dolan,* 215 Md. App. at 34, 79 A.3d at 400 (finding that the parties did not create an enforceable oral contract where they spoke only in general terms about what the plaintiff would do in exchange for a share in the defendant's business, such as "planning"); *Mogavero*, 142 Md. App. at 273, 790 A.2d at 51 (holding that the plaintiff's assertion that he would help the defendant "with the construction end of the project" was too vague and indefinite to constitute an enforceable promise); *see also Peoples Drug Stores, Inc. v. Fenton Realty Corp.,* 191 Md. 489, 493, 62 A.2d 273, 275 (1948)) ("[T]he terms of ... a contract must be 'in all respects definitely understood and agreed upon.'").

Moreover, in his reply email, Kantsevoy stated only that he was "interested" in Piskun's proposal and that the parties could "discuss more details" at another time. ECF 172-5. This was not an "unqualified and unequivocal acceptance." *Duplex Envelope Co. v. Balt. Post Co.*, 163 Md. 596, 691, 163 A. 688, 692 (1933); *see also Learning Works, Inc. v. Learning Annex, Inc.,* 830 F.2d 541, 543 (4th Cir. 1987) ("Maryland law ... requires unqualified acceptance of an offer before a contract can be formed."). To be sure, Kantsevoy indicated that he would consider entering into a consulting agreement with LumenR, but the details of any such agreement remained open for discussion. Thus, even assuming Piskun's email was a valid offer, Kantsevoy's reply email did not constitute adequate acceptance of the offer. *See Cochran,* 398 Md. at 14, 919 A.2d at 708 ("It

is universally accepted that a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract.").

Nor does the parties' course of conduct following the June 12, 2010 email exchange support Kantsevoy's assertion that the parties formed a binding, express contract. Kantsevoy did not begin working for LumenR until February 2012—some twenty months after this email exchange. And, as LumenR points out, three days after he began working for LumenR, Piskun sent Kantsevoy an email that read, in relevant part, ECF 172-6: "Sergey, $2K check for [L]umenr lab is coming to you this week. Is it acceptable? ... We will create an agreement for you similar to HET shortly (Scientific advisor). Ok?" Although this amount was less than the $2,500 *per diem* rate outlined in Piskun's June 12, 2010 email, Kantsevoy replied: "Sure, Gregory, thank you!" *Id.* This discussion supports the finding that the parties believed the terms of any discussion concerning consulting work remained open after the June 12, 2010 email exchange.

Accordingly, Kantsevoy has failed to demonstrate that he is entitled to judgment as a matter of law on his claim for breach of express contract. However, in a footnote, Kantsevoy asserts: "Even if the written June 12, 2010 contract was too indefinite to be enforced, summary judgment as to liability is proper on Professor Kantsevoy's implied-in-fact contract claim." ECF 179 at 14 n.79. Specifically, he argues that he is entitled to summary judgment on his implied-in-fact contract claim because "LumenR was well aware both of Professor Kantsevoy's work and his desire to be paid." *Id.*

As discussed, an implied-in-fact contract is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of [people]." *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688. Moreover, as stated earlier, "a party seeking summary judgment always bears the

-34-

initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

Kantsevoy has failed to satisfy this burden in his brief footnote. And, in any event, there is a genuine dispute of material fact regarding the existence of an implied-in-fact contract between the parties, so as to require LumenR to compensate Kantsevoy for all of his services. That is, Piskun stated in his Declaration that "LumenR was not aware that Kantsevoy was performing many of the tasks that he alleges to have performed." ECF 185-1, ¶ 6. Therefore, the Court denies Kantsevoy's "motion" for summary judgment as to Count II of his Complaint, for breach of implied-in-fact contract.

In sum, Kantsevoy has not established that he is entitled to summary judgment on his claims for breach of express contract or breach of implied-in-fact contract. Thus, the Court denies the Kantsevoy Motion as to these claims.

## B. LumenR's Claims

LumenR's Answer and Countercomplaint asserts four counterclaims against Kantsevoy: breach of express contract (First Counterclaim); breach of implied-in-fact contract (Second Counterclaim); tortious interference with business relations (Third Counterclaim); and deceit (Fourth Counterclaim). ECF 12 at 18–22. LumenR also raises a number of affirmative defenses to Kantsevoy's claims. *Id.* at 8–10.

In my Memorandum (ECF 169) and Order (ECF 170) of March 13, 2018, I dismissed LumenR's counterclaim for deceit. The other counterclaims and affirmative defenses remain.

LumenR now moves for summary judgment on its counterclaim against Kantsevoy for tortious interference with business relations. ECF 172. Kantsevoy opposes the LumenR Motion and moves for summary judgment on each of LumenR's three remaining counterclaims. ECF 178. LumenR does not oppose the Kantsevoy Motion as to its First Counterclaim, for breach of express contract, but it opposes the remainder. *See* ECF 186 at 27.

### A. Prudential Standing

Kantsevoy argues that LumenR assigned its right to the data from his clinical trials, if any, to BSC under the Asset Purchase Agreement. ECF 179 at 16–18. Therefore, Kantsevoy maintains that LumenR lacks prudential standing to assert counterclaims that are based on his refusal to provide it with the clinical data. *Id.*

The doctrine of standing consists of two distinct "strands": constitutional standing pursuant to Article III and prudential standing. *See Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11 (2004). The requirements for constitutional standing reflect that Article III "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright,* 468 U.S. 737, 750 (1984); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1993) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III[.]"). To establish Article III standing, a plaintiff must demonstrate that:

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Doe v. Obama,* 631 F.3d 157, 160 (4th Cir. 2011) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000)).

In addition to satisfying constitutional standing requirements, however, a plaintiff must also demonstrate that his claims are not barred by prudential limitations on a federal court's

exercise of jurisdiction. *See Doe v. Sebelius,* 676 F. Supp. 2d 423, 428 (D. Md. 2009) (citing *Elk Grove Unified Sch. Distr.,* 542 U.S. at 12). In contrast to Article III standing, prudential standing "'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Distr.,* 542 U.S. at 11. One such limitation is that "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499 (1975). This limitation serves to "preclude a court from deciding 'questions of broad social import in cases in which no individual rights will be vindicated'" and to ensure that "'access to the federal courts [is] limited to those litigants best suited to assert the claims.'" *Buchanan v. Consolidated Stores Corp.,* 125 F. Supp. 2d 730, 738 (D. Md. 2001) (quoting *Mackey v. Nationwide Ins.,* 724 F.2d 419, 422 (4th Cir. 1984)).

Kantsevoy argues that LumenR lacks prudential standing to assert "any counterclaim predicated on Professor Kantsevoy's decision to not hand over the clinical trial data" because LumenR assigned its right to the data, if any, to BSC. ECF 179 at 18. As a threshold matter, the Court notes that only LumenR's counterclaims for breach of express contract and breach of implied-in-fact contract are based on Kantsevoy's failure to provide it with the clinical data. *See* ECF 12 at 18–22. Its counterclaim for tortious interference with business relations, on the other hand, is based on Kantsevoy's intrusion into its negotiations with BSC. *See id.*; *see also* ECF 186 at 27 ("To be clear, although LumenR believes that Kantsevoy is improperly withholding the clinical trial data, that wrong is being pursued in LumenR's contract-based counterclaims. LumenR's tortious interference counterclaim is not based on this breach by Kantsevoy."). Accordingly, Kantsevoy's prudential standing challenge is directed only to LumenR's counterclaims for breach of express contract and breach of implied-in-fact contract.

In its opposition, LumenR contends that Kantsevoy waived his defense based on prudential standing by failing to assert it previously. ECF 186 at 23. In addition, LumenR argues that it has prudential standing because it did not transfer its right to the clinical reports to BSC under the terms of the Asset Purchase Agreement. *Id.* at 24–26.

There is significant disagreement among the Circuits on whether objections to prudential standing can be waived. *Compare Bd. of Miss. Levee Comm'rs v. EPA,* 674 F.3d 409, 417–18 (5th Cir. 2012) (waivable); *The Wilderness Soc. v. Kane Cty., Utah,* 632 F.3d 1162, 1168 n.1 (10th Cir. 2011) (waivable); *RK Co. v. See,* 622 F.3d 846, 851–52 (7th Cir. 2010) (waivable); *City of Los Angeles v. County of Kern,* 581 F.3d 841, 845 (9th Cir. 2009) (waivable), *with Cmty. First Bank v. Nat'l Credit Union Admin.,* 41 F.3d 1050, 1053 (6th Cir. 1994) (not waivable); *Animal Legal Defense Fund, Inc. v. Espy,* 29 F.3d 720, 723 n.2 (D.C. Cir. 1994) (not waivable); *and Thompson v. County of Franklin,* 15 F.3d 245, 248 (2d Cir. 1994) (not waivable). The Fourth Circuit has implied that the defense of prudential standing is waivable but, to my knowledge, it has never addressed the issue directly. *See United States v. Day,* 700 F.3d 713, 721 (4th Cir. 2012) ("Unlike Article III standing, issues of prudential standing are non-jurisdictional and may be 'pretermitted in favor of a straightforward disposition on the merits.'") (quoting *Finsteun v. Crutcher*, 496 F.3d 1139, 1147 (10th Cir. 2007) (internal quotation marks omitted)); *Kennedy v. Allera*, 612 F.3d 261, 270 n.3 (4th Cir. 2010) (stating that "prudential standing questions may be avoided in order to decide a case on the merits").

Even assuming, *arguendo*, that the defense of prudential standing is waivable, it has not been waived here. Courts have generally only found waiver of this defense where it was first raised on the eve of trial, at trial, or in post-trial proceedings. *See, e.g., Ensley v. Cody Res. Inc.*, 171 F.3d 315, 320 (5th Cir. 1999) (defense waived where it was not raised until after the plaintiff's

case-in-chief); *Gogolin & Stelter v. Karn's Auto Imports, Inc.,* 886 F.2d 100, 102–03 (5th Cir. 1989) (defense waived where it was first raised in a motion for directed verdict), *cert. denied,* 494 U.S. 1031 (1990); *Hefley v. Jones,* 687 F.2d 1383, 1386–88 (10th Cir. 1982) (defense waived where it was not raised until sixteen days before trial); *Nikimiha Secs. Ltd. v. Trend Grp. Ltd.,* 646 F. Supp. 1211, 1224 (E.D. Pa. 1986) (defense waived where it was first raised during trial). Kantsevoy, by contrast, raises this defense in his summary judgment motion, before a trial has even been scheduled in the case. Accordingly, I shall proceed to the merits of Kantsevoy's prudential standing argument.

The essence of Kantsevoy's prudential standing challenge is that LumenR assigned any right it had to the clinical reports to BSC. ECF 179 at 18. As Kantsevoy recognizes, this argument also goes to the merits of LumenR's contract-based counterclaims. *See* ECF 190 at 14–15 ("Moreover, even if the prudential standing affirmative defense had been waived, LumenR's implied-in-fact contract claim still fails substantively for lack of any current contractual obligation owed to LumenR."). Indeed, some courts have found that such an argument is not properly considered as an issue of standing but, in fact, goes to the merits of the contract claim. *See Katz v. Pershing, LLC,* 672 F.3d 64, 72 (1st Cir. 2012) (finding that the defendant's argument that the plaintiff does not have the contract right asserted in her complaint goes not to standing but to whether she stated an actionable claim); *see also Novartis Seeds, Inc. v. Monsanto Co.,* 190 F.3d 868, 871 (8th Cir. 1999) (stating that the defendant's assertion that the plaintiff had no legal right to complain of any alleged breach "establishes no more than a defense on the merits").

In any event, LumenR has not assigned its right to the clinical reports to BSC. Therefore, I need not decide whether Kantsevoy properly raises this argument as an issue of prudential standing.

-39-

Maryland recognizes the modern rule that a "chose in action, whether arising in tort or ex contractu, is generally assignable." *Summers v. Freishtat*, 274 Md. 404, 407, 335 A.2d 89, 90–91 (1975). The only limitation, in the absence of a contrary statutory provision, is that the right of action be of a sort which would survive the death of the assignor and pass to his personal representatives." *Id.* (citations and footnote omitted). *But see* W.W. Allen, Annotation, *Assignability of Right to Rescind or of Right to Return of Money or Other Property as Incident of Rescission,* 110 A.L.R. 849 (1937) (stating that "most of the cases give support to the proposition that a mere naked right to rescind or to sue for a rescission is not assignable" but acknowledging that "where the assignment is, in form, merely of a 'claim' or cause of action, it is, by some courts, upheld, if regarded as carrying with it the beneficial interest [in the property], or, as is sometimes held, a share therein" (footnotes omitted)).

"Contractual rights are assigned when the assignor manifests the intent to make the assignment." *La Belle Epoque, LLC v. Old Europe Antidue Manor, LLC*, 406 Md. 194, 211–12, 958 A.2d 269, 279 (2008). *See also Central Collection v. Columbia Med.,* 300 Md. 318, 331, 478 A.2d 303, 309 (1984) ("In determining the validity of [the] assignment we look to the intent of the parties."); *accord* E. Allen Farnsworth, Farnsworth on Contracts, *Assignment and Delegation,* § 11.3 at 69 (3rd ed. 2004) ("Whether the owner of a right has manifested an intention to transfer it is a question of contract interpretation to be answered from all the circumstances, including words and other conduct.").

With these principles in mind, the Court turns to the language of the Asset Purchase Agreement executed by LumenR and BSC on November 1, 2016. ECF 173-4. Section 1.1 of the Asset Purchase Agreement broadly provides, in relevant part, *id.* at 1:

Acquired Assets: Subject to the terms and conditions set forth in this Agreement, at the Closing, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



A subsection further defines Acquired Assets to include █████████████████
████████████████████████████ *Id.* at 2. According to Kantsevoy, these terms make clear that LumenR assigned its right to the clinical data, and all causes of action related thereto, to BSC. ECF 179 at 17.

But, the definition of Acquired Assets states that it is "[s]ubject to the terms and conditions set forth in this Agreement." ECF 173-4 at 1. And, another provision of the Asset Purchase Agreement explicitly addresses the clinical reports. That is, the Agreement provides for a future payment of ███████ to LumenR if it achieves the "Transfer Technology Milestone." ECF 173-4 at 5. In turn, the Transfer Technology Milestone consists of two separate milestones: a "Technology Transfer Tasks Milestone," with an associated payment of ███████ and a "Technology Transfer Clinical Report Milestone," with an associated payment of ███████. *Id.*

As defined in the Asset Purchase Agreement, the Technology Transfer Clinical Report Milestone "shall be deemed to have been achieved when Task 9 as set forth on Exhibit C has been completed to the reasonable satisfaction of the Buyer … provided that [the] Technology Transfer Clinical Report Milestone shall not be deemed to have been achieved unless and until the Technology Transfer Tasks Milestone has been achieved." *Id.* Task 9 on Exhibit C provides as

follows: "The Company shall provide Buyer with copies of all case report forms (or equivalent summaries thereof) associated with at least ⬛ clinical cases conducted with the LumenR left colon device according to the IRB approved study protocol." *Id.* at 81–82.

Michael Ryan, the BSC employee who led the company's negotiations with LumenR, explained the intersection of these terms in the following portion of his deposition, ECF 173-3, Tr. 137:1–138:17:

> Q: And under [T]echnology [T]ransfer [M]ilestone task item 9, clinical, "The company shall provide buyer with copies of all case report forms or equivalent summaries thereof associated with at least ⬛ clinical cases conducted with the LumenR left colon device according to the IRB-approved study protocol." Correct?
>
> A: Yes.
>
> Q: Is that a reference to the clinical trial case report forms from Dr. Kantsevoy?
>
> A: Yes.
>
> Q: And according to the [T]echnology [T]ransfer [C]linical [R]eport [M]ilestone, this milestone is completed when those forms are provided. Correct?
>
> A: Yes.
>
> Q: And turning back to page 5, there is the [T]echnology [T]ransfer [C]linical [R]eport [M]ilestone payment amount?
>
> A: Yes.
>
> Q: And that means ⬛. Correct?
>
> A: Yes.
>
> Q: So the specific task in item 9, which is now the [T]echnology [T]ransfer [C]linical [R]eport milestone, is valued at ⬛. Correct?
>
> A: Yes.

In other words, according to the Asset Purchase Agreement, ██████ of BSC's ████ Technology Transfer Milestone payment to LumenR is contingent upon LumenR providing BSC with copies of the reports from Kantsevoy's clinical trials.

The Technology Transfer Clinical Report Milestone demonstrates that BSC and LumenR understood that LumenR did not have copies of the clinical reports in its possession at the time the Asset Purchase Agreement was executed. Otherwise, the clinical reports would have been among the Acquired Assets transferred to BSC at closing. And, if BSC believed that it had already obtained the right to the reports at the close of the transaction, BSC would not have offered LumenR a future payment of ██████, contingent upon LumenR providing the clinical reports. Thus, this provision indicates that BSC and LumenR intended for LumenR to retain the rights necessary to procure the clinical reports from Kantsevoy. In other words, the reports were not part of the assets acquired by BSC upon closing.

Another provision of the Asset Purchase Agreement further supports the finding that LumenR did not assign any right to the clinical reports. Specifically, as LumenR points out, Schedule 5.16 of the Asset Purchase Agreement is titled "Liabilities" and provides, ECF 186-3:





(emphasis added).

This provision shows that BSC contemplated a future agreement between LumenR and Kantsevoy. And, it chose to exclude from the Asset Purchase Agreement any liabilities arising from that agreement. More significantly, however, BSC and LumenR recognized that LumenR reserved the right to "acquire certain other rights and/or clinical data" pursuant to an agreement with Kantsevoy. *Id.* Although an agreement was never reached between LumenR and Kantsevoy, this provision further indicates that BSC and LumenR left to LumenR the burden, and the benefits, of resolving its outstanding dispute with Kantsevoy.

Considered in its entirety, the Asset Purchase Agreement demonstrates that BSC and LumenR did not intend for LumenR to assign away contract right to Kantsevoy's clinical reports at closing. Accordingly, such an assignment has not been effected. *See La Belle Epoque, LLC*, 406 Md. at 211–12, 958 A.2d at 279 ("Contractual rights are assigned when the assignor manifests the intent to make the assignment."); *see also Edmunds v. CBC Enter., Inc.,* 544 S.E.2d 324, 327 (Va. 2001) ("[I]f the assignor retains any control whatsoever over the fund or property to be assigned, then an assignment has not been effected."). *Cf. duPont de-Bie v. Vredenburgh*, 490 F.2d 1057, 1061 (4th Cir. 1974) ("It is clear to us that it was her intention to assign all of her rights under such agreement.").

Thus, even assuming that Kantsevoy properly raises this argument as an issue of prudential standing, his argument fails.

### B.     First Counterclaim

LumenR's First Counterclaim alleges breach of express contract. ECF 12 at 18–19. Specifically, LumenR alleges that "Kantsevoy is in breach of an expressed [sic] oral contract to

provide the completed data collection forms finished pursuant to the relevant clinical trial of the LumenR device to LumenR." *Id.*

As discussed, to "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor*, 365 Md. at 175, 776 A.2d at 651.

Kantsevoy moves for summary judgment on LumenR's counterclaim for breach of express contract. ECF 179 at 18–20. He argues that this counterclaim fails as a matter of law because there is no evidence in the record supporting LumenR's allegation that he expressly agreed to provide it with the data from his clinical trials. *Id.* Further, Kantsevoy asserts that LumenR's managing agents acknowledged that it had no right to his clinical data on multiple occasions. *Id.* For instance, he points out that on September 21, 2016, Piskun sent a text message to Erdo Okatan, another LumenR executive, which states: "The key is that it is not our data and we can't promise it." ECF 179-21.

LumenR does not oppose the Kantsevoy Motion as to its counterclaim for breach of express contract. ECF 186 at 27 ("To simplify this litigation, LumenR does not oppose Kantsevoy's motion to dismiss LumenR's counterclaim for express contract for recovery of the clinical trial case report forms."). Accordingly, "those facts established by the motion" are "uncontroverted." *Custer v. Pan Am. Life Ins. Co.,* 12 F.3d 410, 416 (4th Cir. 1993). And, on the facts before it, the Court finds that Kantsevoy is entitled to judgment as a matter of law on this counterclaim, because there is no evidence that he expressly agreed to provide the data from his clinical trials to LumenR. *See id.* (noting that the court must still review the unopposed motion on the merits to determine if summary judgment is appropriate).

Therefore, the Court grants the Kantsevoy Motion as to LumenR's First Counterclaim.

## C. Second Counterclaim

Kantsevoy also moves for summary judgment on LumenR's Second Counterclaim, for breach of implied-in-fact contract. ECF 178. As noted, an implied-in-fact contract is "an agreement which can legitimately be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of [people]." *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688.

LumenR's counterclaim for breach of implied-in-fact contract is based on "Kantsevoy's failure to provide completed data collection forms to LumenR." ECF 12 at 19. LumenR alleges that the "well-established practice in the industry is for a clinical trial investigator and/or trial sponsor to provide completed data collection forms to the entity whose product is being tested, when that entity provides devices and expertise to support the trial." *Id.* Further, LumenR alleges that it "provided devices and expertise to Kantsevoy" to support his clinical trial with the Tissue Retractor and, therefore, it "had a reasonable expectation that Kantsevoy ... would provide the completed data collection forms to LumenR." *Id.*

Kantsevoy does not dispute LumenR's allegation that it provided "devices and expertise" to support the self-sponsored clinical trials that he conducted with the Tissue Retractor. ECF 179 at 21–23. However, he argues that neither industry practice nor the parties' course of conduct supports the existence of an implied-in-fact contract requiring him to provide LumenR the data from those trials. *Id.* Kantsevoy further asserts that, even if LumenR had a contract right to the data at one time, it assigned that right to BSC in the Asset Purchase Agreement. ECF 179 at 16–18; ECF 190 at 14.

The Court already determined that LumenR's contract right to the clinical reports, if any, was not assigned to BSC under the Asset Purchase Agreement. Accordingly, the question is

whether Kantsevoy is nonetheless entitled to summary judgment on LumenR's Second Counterclaim.

LumenR opposes Kantsevoy's motion for summary judgment on its counterclaim for breach of implied-in-fact contract. ECF 186 at 24–30. It points out that Kantsevoy previously performed clinical trial work for another company founded by Piskun, HET Systems. And, as provided in the HET Agreement, Kantsevoy submitted copies of his clinical trial reports to HET Systems in exchange for $500. ECF 185-1, ¶ 3; *see also* ECF 172-7 at 1–2. According to LumenR, this course of conduct between the parties supports the existence of an implied-in-fact contract requiring Kantsevoy to provide it with copies of his clinical trial reports. ECF 186 at 28.

LumenR also maintains that industry practice supports the existence of an implied-in-fact contract between the parties. ECF 186 at 28–30. In support of its opposition, it submitted the rebuttal report of its expert, Kevin Dill, who opined that "when a device manufacturer provides in-kind support in the form of free devices and other technical support ... that manufacturer would have a reasonable expectation of having at least access to the resulting data, including copies of the case report forms." ECF 185-11, ¶ 9. Dill further stated that "the primary objectives of clinical trials are typically directed to confirming safety and efficacy," and that "[a]ccess to clinical trial data is critical to the manufacturer in this respect." *Id.* ¶ 4. LumenR asserts that, in light of the conflicting evidence regarding industry practice, summary judgment is inappropriate. ECF 186 at 30.

In his reply, Kantsevoy argues that the parties' course of conduct does not support LumenR's Second Counterclaim. ECF 190 at 12. Plaintiff points out that, unlike the HET Agreement that he executed with HET Systems, he never entered into an express contract with

LumenR, requiring him to provide copies of his clinical trial reports.[3] *Id.* In addition, he notes that the clinical trials he conducted for HET Systems were sponsored by the company. *Id.* The clinical trials he performed for LumenR, on the other hand, were self-sponsored, and therefore LumenR did not compensate him for his work on the clinical trials that he conducted with the Tissue Retractor. *Id.* In light of these differences between the nature of his work for HET Systems and LumenR, Kantsevoy argues that the parties' course of conduct does not support the existence of an implied-in-fact contract entitling LumenR to the reports from his clinical trials. ECF 190 at 12.

In addition, Kantsevoy maintains that the statements of LumenR's managing agents support the conclusion that LumenR has no implied-in-fact contract right to the clinical data. ECF 179-23. As noted, Piskun sent a text message to Okatan on September 21, 2016, which states: "The key is that it is not our data and we can't promise it." ECF 179-21. In addition, Piskun sent an email to Okatan on June 11, 2015 which states, in relevant part: "Since study is not sponsored by LumenR, we don't have details of these data." ECF 179-29. According to Kantsevoy, these statements illustrate that LumenR knew that he never agreed, directly or indirectly, to provide LumenR with his clinical data. ECF 190 at 11.

But, other evidence in the record indicates that LumenR believed that Kantsevoy *did* agree to provide it with access to his clinical data. That is, in Piskun's email to Okatan of June 11, 2015,

---

[3] Kantsevoy also argues that LumenR cannot rely on the HET Agreement to support its counterclaim for breach of implied-in-fact contract because this Court previously "ruled that the HET [A]greement is not probative of the parties' course of dealings or course of performance." ECF 179 at 23–24. This argument is without merit. In its Memorandum Opinion on the parties' motions for judgment on the pleadings, the Court found only that, "on the basis of [Kantsevoy's] pleadings alone," the HET Agreement did not inform Kantsevoy's alleged agreement with LumenR for equity compensation. ECF 169 at 43. The Court did not find that the HET Agreement, or the parties' performance under the Agreement, could not be used to inform the existence of an implied-in-fact contract between Kantsevoy and LumenR for the clinical data.

Piskun recognized that LumenR did not control the data but nonetheless wrote: "They can discuss non-published data with Dr. Kantsevoy." ECF 179-29. Piskun also noted that Kantsevoy had presented the clinical data earlier that year. *Id.* These statements suggest that LumenR expected, and indeed was provided, with some level of access to Kantsevoy's clinical data.

Plaintiff relies on contract related principles to support his claim. A reasonable trier of fact could find that the parties contemplated that Kantsevoy would provide LumenR with his data in order to be paid, and that the parties' course of performance on the HET project, along with the evidence of industry practice submitted by LumenR, demonstrate an agreement between the parties entitling LumenR to copies of the data from Kantsevoy's clinical trials. Viewed in the light most favorable to LumenR, there is a genuine dispute of material fact regarding the existence of an implied-in-fact contract. Accordingly, I shall deny the Kantsevoy Motion as to LumenR's Second Counterclaim.

### D.    Third Counterclaim

LumenR and Kantsevoy cross-move for summary judgment on LumenR's Third Counterclaim, for tortious interference with business relations. ECF 172; ECF 178. This counterclaim alleges that Kantsevoy "engaged in intentional and willful acts that were designed to impair the reputation and good will of LumenR as a company and its LumenR retractor system in the eyes of [BSC] while LumenR was negotiating transactions with [BSC]." ECF 12 at 20; *see also* ECF 173 at 19. Specifically, according to LumenR, Kantsevoy made damaging statements about LumenR to BSC employees and threatened to release negative information about LumenR if it did not resolve its outstanding compensation dispute with him. ECF 12 at 20; ECF 173 at 19–20. LumenR further alleges that, "as a result of Kantsevoy's interference, [BSC] included a

-49-

number of material provisions in the transaction that substantially diminished the value of the transaction to LumenR." ECF 12 at 20.

The tort of intentional interference with contractual or business relations is "well-established in Maryland." *Macklin v. Robert Logan Assocs.,* 334 Md. 287, 296, 639 A.2d 112, 116 (1994). Broadly stated, it provides that "one not privileged to do so who purposely induces or causes a third person not to perform a contract or enter into or continue a business relation with another is liable for the harm caused thereby." *United Rental Equip. Co. v. Potts & Callahan Contracting Co.,* 231 Md. 552, 560, 191 A.2d 570, 574 (1963).

The Maryland Court of Appeals reiterated the elements of the tort in *Blondell v. Littlepage,* 413 Md. 96, 125, 991 A.2d 80, 97 (2010) (quoting *Kaser v. Fin. Protection Mktg. Inc.,* 376 Md. 621, 628–29, 831 A.2d 49, 53 (2003)), as follows:

> A claim for intentional interference with contractual or business relations requires the following elements: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

The tort has "two general manifestations." *Macklin*, 334 Md. at 297, 639 A.2d at 117. The first manifestation is often described as "'inducing the breach of an existing contract,'" and the second, "more broadly, constitutes maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Blondell*, 413 Md. at 125, 991 A.2d at 97 (citation omitted). In other words, under Maryland law, one may claim tortious interference with a contract or, in the absence of a contract or breach of contract, one may claim tortious interference with business or economic relations.

The Maryland Court of Appeals has provided an illustrative list of "types of wrongful or unlawful acts that could form the basis" for the second manifestation of the tort. *Berry*, 360 Md.

at 153, 757 A.2d at 113. These include "'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *Id.*

"In order to sustain a claim for tortious interference with prospective advantage 'plaintiffs must identify a possible future relationship which is likely to occur, absent the interference, with specificity.'" *Mixter v. Farmer*, 215 Md. App. 536, 549, 81 A.3d 631, 638 (2013) (quoting *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 546 (D. Md. 2006) (citing Maryland law)). "That is, a plaintiff '*must* establish some evidence that a prospective business relationship is likely to occur.'" *Press v. United States*, JKB-17-1667, 2018 WL 1211537, at *9 (D. Md. Mar. 8, 2018) (citation omitted) (emphasis in original). "After all, without this showing, it is unclear how any of the following elements could be established: causation, damages, or indeed the defendants' wrongful intent to interfere with the relationship." *Baron Fin. Corp.*, 471 F. Supp. 2d at 546 (internal citations omitted).

Kantsevoy attacks only the fourth element of LumenR's counterclaim for tortious interference with business relations. *See* ECF 179 at 24. Specifically, he argues that this counterclaim fails as a matter of law because LumenR did not suffer any "actual damage and loss." *Id.* In addition, he asserts that LumenR failed to establish that his purported inferences caused its alleged injury. *Id.* at 31–33.

"In any tort action, the plaintiff must establish that the defendant's tortious conduct was a cause in fact of the injury for which compensation is sought." *Med. Mut. Liab. Soc. of Md. v. B. Dixon Evander & Assocs.*, 339 Md. 41, 54–55, 660 A.2d 433, 439–40 (1995); *see also Peterson v. Underwood*, 258 Md. 9, 16–17, 264 A.2d 851, 855 (1970) (stating that "[c]ausation in fact is concerned with the ... inquiry of whether defendant's conduct *actually* produced an injury"); *Abend*

*v. Sieber,* 161 Md. 645, 649, 158 A. 63, 64 (1932). Thus, "the burden is on the plaintiff to prove by a preponderance of the evidence that 'it is more probable than not that defendant's act caused his injury.'" *Evander,* 339 Md. at 54, 660 A.2d at 440 (quoting *Fennell v. S. Md. Hosp.,* 320 Md. 776, 787, 580 A.2d 206, 211 (1990)). In addition, the plaintiff must establish that any damages sought are a "natural, proximate and direct effect of the tortious misconduct." *Jones v. Malinowski,* 299 Md. 257, 269, 473 A.2d 429, 435 (1984).

LumenR's alleged injury is based on the modification of the Technology Transfer Milestone outlined in the letter of intent, or Term Sheet, signed by LumenR and BSC. ECF 173 at 23. That is, the Term Sheet included a Technology Transfer Milestone with an associated ▬▬▬ ▬▬▬ payment. *See* ECF 173-2 at 2. Piskun stated in his Declaration that "LumenR would have been able to satisfy" this milestone. ECF 185-1, ¶ 8. In the Asset Purchase Agreement, however, the Technology Transfer Milestone was reduced to ▬▬▬▬ and a Clinical Report Milestone, with an associated payment of ▬▬▬▬ was added. *See* ECF 173-4 at 5. As discussed earlier, this new milestone requires LumenR to produce the data from Kantsevoy's clinical trials. ECF 173-3, Tr. 137:1–138:2; ECF 185-1, ¶ 8. According to Piskun, "LumenR has not, and currently cannot, satisfy the Clinical Trial Data milestone." ECF 185-1, ¶ 9.

LumenR argues that Kantsevoy's damaging statements about the company caused BSC to alter the payment by adding the Clinical Report Milestone in the Asset Purchase Agreement and reducing the payment under the Technology Transfer Milestone. ECF 173 at 23. It points out that, during its negotiations with BSC, Kantsevoy sent a text message to Brandon Gunther, a BSC employee, which states, ECF 172-18 at 5: "LumenR is lying to Boston Scientific. They want to sign deal with [a] higher payoff pretending that they are negotiating with me." In addition, Kantsevoy sent an email to Gunther in which he proposed ways for BSC to structure its deal with

LumenR to address his "fair compensation." *See* ECF 172-19. Specifically, he suggested that BSC purchase LumenR at a reduced price or execute a three-party contract in which Kantsevoy's "compensation is subtracted from the money previously allocated for LumenR." *Id.*

Further, LumenR notes that Michael Ryan, the BSC employee who led the company's negotiations with LumenR, stated that the Asset Purchase Agreement was structured so that "LumenR's incentives are aligned to share value equitably with Kantsevoy." ECF 173-1 at 1. Ryan also asserted that the ██████ Clinical Report Milestone can only be received through Kantsevoy's cooperation and thus it "creates and [sic] incentive for LumenR to offer him up to ██████ to maximize their own proceeds." *Id.*

According to LumenR, these undisputed facts confirm that Kantsevoy's conduct caused BSC to create the Clinical Report Milestone in the Asset Purchase Agreement. As a result, he reduced the value of LumenR's transaction by ██████. ECF 173 at 23.

But, in his opposition, Kantsevoy demonstrates that there is, indeed, a genuine dispute of material fact as to causation. *See* ECF 179 at 31–33. In particular, Kantsevoy submitted the following portion of Ryan's deposition testimony, ECF 179-20, Tr. 209:19–210:15:

> Q: Mr. Ryan, can you explain where the idea for the technology transfer clinical report milestone in the asset purchase agreement originated?
>
> A: During the due diligence we identified deficiencies and we sought, as previously discussed, to expand on the set of deliverables that LumenR would have to deliver in order to achieve its milestones.
>
> One of those deliverables identified early, when we discovered that we were not getting access to it during diligence, was the clinical case report forms, which were of interest to us and we wanted possession of.
>
> In October, Dr. Piskun expressed his concerns about his ability to deliver that deliverable. And in response to that, we separated it off as its own milestone so that the ██████ milestone would be achievable whether or not that deliverable was met and the ██████ milestone would be achievable only if that deliverable was met.

-53-

Based on this testimony, a reasonable trier of fact could find that it was more probable than not that LumenR's failure to provide the clinical reports to BSC in the months following the execution of the Term Sheet, rather than Kantsevoy's statements to BSC employees about LumenR, caused BSC to modify the milestone payments. Accordingly, the Court will deny LumenR's motion for summary judgment on its counterclaim for tortious interference with business relations.

The remaining question is whether Kantsevoy is entitled to summary judgment on this counterclaim. He asserts that LumenR's counterclaim for tortious interference fails for lack of damages because "there is no admissible evidence that LumenR actually met the requirements of the [T]echnology [T]ransfer [M]ilestone in the [T]erm [S]heet." ECF 179 at 25. Kantsevoy explains his argument in a brief footnote. *Id.* at 25 n.110. He points out that Piskun stated in his Declaration that "[b]y July 2017, LumenR had already satisfied the modified Technology Transfer Tasks Milestone in the final Asset Purchase Agreement, and received the ████████ payment from BSC for this milestone." ECF 186-1, ¶ 9. According to Kantsevoy, however, LumenR did not provide information about this payment during discovery. ECF 179 at 25 n.110. Thus, plaintiff asks the Court to disregard Piskun's Declaration in deciding the instant motions. He claims that, without this evidence, LumenR's counterclaim fails as a matter of law because LumenR cannot show that it was deprived of the ████████ payment allocated to the Clinical Report Milestone. *Id.*

At the summary judgment stage, the parties must support their motions with evidence that "[could] be presented in a form that would be admissible." Fed. R. Civ. P. 56 (c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The contours of Kantsevoy's evidentiary dispute are unclear. He does not argue that Piskun, the founder and CEO of LumenR, lacks personal knowledge of this payment or is incompetent to testify on these matters. And, Kantsevoy does not cite to any rules to support his argument. However, he appears to contend that exclusion of Piskun's Declaration is warranted under Rule 37 of the Federal Rules of Civil Procedure, because information regarding the ▰▰▰ ▰▰▰▰ payment to LumenR was never disclosed during discovery.

Rule 37(c)(1) provides, in relevant part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The basic purpose of Rule 37(c)(1) is to prevent surprise and prejudice to the opposing party. *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).

The Court is unable to discern from the information before it – limited to three footnotes – that there *was* a discovery violation. However, even assuming, *arguendo*, that LumenR improperly failed to disclose information about this payment, the Court's consideration of Piskun's Declaration at this stage in no way prejudices Kantsevoy. Piskun was deposed by Kantsevoy's counsel, and this Court only relies on Piskun's Declaration to find that summary judgment is inappropriate on LumenR's counterclaim for tortious interference. ECF 186 at 7 n.2. To the extent that further discovery is necessary to cure the surprise of any nondisclosure, Kantsevoy is welcome to petition the Court to reopen discovery.

On the record before it, the Court finds that there is a genuine dispute of material fact as to whether LumenR suffered actual damages and harm as a result of the statements that Kantsevoy made to BSC employees about LumenR. A reasonable trier of fact could find that LumenR would have received the entire ████████ Technology Transfer Milestone payment in the Term Sheet but for the articulation of the ████████ Clinical Report Milestone in the Asset Purchase Agreement. In addition, a reasonable trier of fact could find that Kantsevoy's conduct was not the cause in fact of the modification of the Technology Transfer Milestone. Accordingly, the parties' cross-motions for summary judgment on this counterclaim are denied.

## IV. Conclusion

For the reasons stated, I shall deny the LumenR Motion (ECF 172); I shall grant the Kantsevoy Motion (ECF 178) as to LumenR's counterclaim for breach of express contract, and deny the remainder.

An Order follows.

Date:   March 29, 2019.                          /s/
                                    Ellen Lipton Hollander
                                    United States District Judge